1

2

3

4                         UNITED STATES DISTRICT COURT

5                        NORTHERN DISTRICT OF CALIFORNIA

6

7    EDISON GATLIN, et al.,                    Case No. 21-cv-00370-SI

8                   Plaintiffs,

9         v.                                   ORDER GRANTING IN PART AND
                                               DENYING IN PART MOTIONS TO
10   CONTRA COSTA COUNTY, et al.,              DISMISS FAC

11                  Defendants.                Re: Dkt. Nos. 110, 115

12

13

14         On December 15, 2023, the Court held a hearing on two motions to dismiss plaintiffs' First

15   Amended Complaint ("FAC").  After consideration of the parties' briefing and arguments, the Court

16   GRANTS IN PART AND DENIES IN PART the motions to dismiss.

17

18                                          BACKGROUND

19   I.    Factual Background

20         For the purposes of deciding the motions to dismiss, the Court treats as true the FAC's

21   allegations, which are nothing short of tragic.  Edison Gatlin was born prematurely on August 17,

22   2005, "severely disabled with epilepsy, cerebral palsy, and serious intellectual disabilities."  Dkt.

23   No. 95, FAC at 1 & ¶ 55.  His twin sister did not survive.  *Id.* ¶ 55.  Edison's parents, Clarissa Simms

24   and Edward Gatlin, had one older child and, when Edison was six years old, welcomed twin girls

25   into the family.  *Id.* ¶ 56.  Edison's parents were with him every day and saw to his needs; "Edison

26   was a happy and healthy child in spite of his disabilities and he continued to thrive while in [his

27   parents'] care."  *Id.* ¶ 58.

28         In early 2014, Edison's parents became estranged.  *Id.* ¶ 59.  His mother moved to Oakley,

United States District Court
Northern District of California

California, with all four of her children.  At this point in his life, Edison "was able to eat solid foods with assistance" and "developed no new health issues while under Clarissa's care."  *Id.* ¶¶ 59-60.  His seizures were becoming less frequent and shorter in duration.  *Id.* ¶ 60.

On September 19, 2014, defendant Kimberly Baker, working for Contra Costa County, removed Edison and his siblings from his parents' care "for reasons not related [to] their safety[,]" following Clarissa's arrest.  *Id.* at 15 & ¶ 61.  From the time he entered foster care in Contra Costa County, "Edison was bounced from one inadequate foster placement to another . . . ."  *Id.* at 1.  On September 24, 2014, Edison was placed in the home of Jeffery and Suzanne Collins.  *Id.* ¶ 65.  "As it turned out, on information and belief, the Collins' home was deficient in that Jeffery and Suzanne Collins were incapable of meeting Edison's complex medical and special care needs to such an extent that Edison's health deteriorated dramatically due to the Collins' inadequate and neglectful care."  *Id.*  Edison's weight soon dropped "dramatically[,]" and "[o]n more than one occasion it was reported to the County, particularly to Defendant Baker, that Jeffery and/or Suzanne Collins would lay Edison on the ground in a vulnerable position relative to their other disabled child, that they were unable to control the several children in their home when left near or around Edison, and that he was left in a disheveled and dirty state."  *Id.* ¶¶ 66-67.

Edison remained in the Collins home until May 3, 2015.  *Id.* ¶ 70.  In the intervening time, defendants Craig Thurmond and Georgette Shipe became the County social workers on Edison's case, with defendant Leslie Davis supervising them.  *Id.* ¶ 71.  During his time in the Collins home, Edison's weight dropped from 75 pounds down to 50 pounds.  *Id.* ¶ 83.

From the time Edison entered foster care, various of the County defendants "authorized and directed non-emergency medical examinations and treatment for Edison without his parent's knowledge and without first obtaining a court order."  *Id.* ¶ 74.  This included non-emergency shunt revision surgery in January 2015; Edison's parents were not notified about the surgery, no court order authorizing the surgery was sought or obtained, and Edison's mother was excluded from the hospital.  *Id.* ¶ 76.  In April 2015, Edison again had surgery, this time to have a gastrostomy tube placed, necessitated by the malnourishment he was suffering in foster care.  *Id.* ¶¶ 77-78.

On May 3, 2015, the County removed Edison from the Collins home because Ms. Collins

United States District Court
Northern District of California

was about to have surgery and would be unable to care for him.  *Id.* ¶ 84.  Defendant Shipe, in consultation with defendant Davis, decided to place Edison in the home of Jennifer Dillingham at Jenna-Ray Foster Family Home in Stockton, without assessing the home to ensure it was appropriate for Edison's complex medical needs.  *Id.* ¶¶ 84-86.  Dillingham had one other special needs foster child and four children of her own.  *Id.* ¶ 87.

It was not until June 2015 that the County did a full assessment of Edison's needs, when Shipe and Davis scheduled an appointment with defendant Danielle Wells of Valley Mountain Regional Center, Inc. ("VMRC") to complete Edison's assessment for services and develop his statutorily required Individual Program Plan ("IPP").  *Id.* ¶ 88.  Although Edison's parents' parental rights had not been terminated, Edison's parents were excluded from the assessment meeting held on June 29, 2015.  *Id.* ¶¶ 88-89.  At the meeting, Wells determined that "Edison 'requires supervision' at all times, and is unable to live independently[.]"  *Id.* ¶ 94.  Wells noted that Edison was "non-ambulatory," confined to a wheelchair that he was unable to control independently,  had no verbal language skills, and required "total care for all his toileting needs."  *Id.*  Defendants Dillingham, Shipe, and Wells "agreed together that Dillingham would 'manage and direct all of [Edison's] medical and dental requirements[,]'" despite a lack of parental consent or court order authorizing Dillingham to take over full medical authority for Edison.  *Id.* ¶ 95.

In January 2016, defendant Kerissa Lynch took over as Edison's day-to-day case carrying County social worker.  *Id.* ¶ 99.  In February 2016, "[o]n information and belief, another special needs child died in Dillingham's home under suspicious circumstances[.]"  *Id.* ¶ 101.  No investigation was undertaken to ensure Edison's safety or Dillingham's ability to care for him.  *Id.*

In January 2017, defendant Christy Roland of the County was assigned to assist Lynch in the day-to-day management of Edison's care.  *Id.* ¶ 102.  On or about September 26, 2017, Roland took over primary responsibility for Edison's case.  *Id.*  On May 24, 2018, Dillingham admitted to Roland and Wells that she was unable to meet Edison's medical care and supervision needs.  *Id.* ¶ 104.  A few weeks later it was reported to Roland that Edison had been injured while in his room alone at night; Roland knew of Edison's need for 24/7, one-on-one supervision.  *Id.* ¶ 106.  In August 2018, Roland learned of another incident indicating that Edison was still being left alone in his room

United States District Court
Northern District of California

1    unmonitored.  *Id.* ¶ 108.  On August 20, 2018, Dillingham told Roland and Wells that she was still

2    struggling with and unable to meet Edison's needs.  *Id.* ¶ 109.

3            On November 5, 2018, Edison's teacher reported that he had a 10-minute seizure at school,

4    which was extremely uncharacteristic for him.  *Id.* ¶ 110.  His seizure activity spiked again in

5    January 2019.  *Id.* ¶ 115.

6            On December 13, 2018, Roland and defendant Barbara Crespo (Roland's supervisor) learned

7    from Wells that yet another special needs foster child in Dillingham's home had died of "possible

8    neglect."  *Id.* ¶ 111.  This was the second child to die in Dillingham's home while Edison was living

9    there.  *Id.*  At Edison's status review hearing a week later, Roland and Crespo did not inform the

10   dependency court about this recent death and ensuing investigation.  *Id.* ¶ 113.

11           In February 2019, Edison arrived at school with unexplained injuries to his left eye and his

12   legs, and he had a heavy smell of urine on him.  *Id.* ¶ 116.  On March 7, 2019, it was reported that

13   Community Services, a sub-part of VMRC, had investigated Dillingham and "dinged" her because

14   she did not have nighttime supervision for Edison despite the IPP requiring 24-hour supervision.

15   *Id.* ¶ 117.  According to the FAC, during the investigation,

16           it was learned that Edison was sequestered away from others, in his
             own room where he was left alone unmonitored throughout the day,
17           especially at night.  Edison would bang on the walls when left alone
             in his room.  He would be left in his activity chair in his bedroom with
18           a movie on repeat until his feeding time.  He would only be checked
             on at random times throughout the day.
19

20   *Id.* ¶ 118.  On March 15, 2019, Edison again had unexplained facial injuries, which were reported

21   to Roland.  *Id.* ¶ 120.

22           On April 3, 2019, defendant Julie De Diego of VMRC wrote an email to Roland complaining

23   about Roland's lack of follow-up.  *Id.* ¶ 121.  De Diego complained that in spite of VMRC's

24   concerns from months prior, Roland had taken no steps to ameliorate VMRC's concerns about

25   Edison's care and safety.  *Id.*  De Diego stated that VMRC did not support Edison's placement in

26   the Dillingham home.  *Id.*  That same day, De Diego and Tracy Vaughn (also of VMRC)

27   recommended Edison be placed at Angel's Haven 2, described as "a small family home" in

28   Stockton.  *Id.* ¶ 125.  Two weeks later, County social workers Crespo and Roland, on VMRC's

United States District Court
Northern District of California

4

United States District Court
Northern District of California

recommendation, obtained a court order authorizing them to move Edison to Angel's Haven 2. *Id.* ¶ 126. Neither Crespo nor Roland had themselves assessed Angel's Haven 2 to determine whether it was an appropriate placement. *Id.* at ¶ 126 n.3. Nor had De Diego or Vaughn physically inspected or assessed the Angel's Haven 2 facility before Edison was placed there. *Id.* ¶ 128. Nevertheless, Roland, Crespo, De Diego, and Vaughn conferred and agreed that Angel's Haven 2 could meet Edison's needs. *Id.* ¶ 129. Had they inspected the home, they would have discovered that Angel's Haven 2 had only one staff member on site 24/7 (defendant John Mark Rafael Romero), and one staff member during daytime hours (defendant Marisse Casuco), to service five residents, including at least one other special needs child who required intensive 24/7 care and supervision. *Id.*

Edison was placed at Angel's Haven 2 on May 8, 2019. *Id.* ¶ 130. Nearly three weeks later, on May 28, 2019, defendant Vaughn conducted a home inspection of Angel's Haven 2. *Id.* ¶ 132. On June 10, 2019, County defendant Alexandria Kotran, supervised by defendant Eleanor Walker, took over Edison's case management from Roland. *Id.* ¶¶ 133-134. Kotran visited Edison at school on June 14 and at Angel's Haven 2 on June 22 and July 19, 2019. *Id.* ¶¶ 135-137. During these visits, she noted that Edison's condition was declining, that he looked malnourished, and that his wheelchair was falling apart. *Id.* On August 29, 2019, Kotran made an unannounced visit to Angel's Haven 2, where she found Edison "unattended, parked in front of the TV, in a broken wheelchair, with his head propped up by a neck pillow." *Id.* ¶ 141. When she asked to see his suction machine, she was told there wasn't one. *Id.* Edison required a suction machine because he was at risk of choking. *Id.* That same day, Kotran visited Edison's school, where his teacher again complained about Edison's care, questioned whether Edison was being fed at night, and stated that he didn't seem to be on his seizure medication. *Id.* ¶ 142.

On September 4, 2019, Kotran and VMRC defendant Vaughn communicated with each other about their "concern[s] about services not being in place for Edison." *Id.* ¶ 144. These included the lack of suction machine and his broken and unsafe wheelchair. *Id.* They discussed these concerns again at a meeting later that week and eventually came up with a plan to make sure he got his suction machine. *Id.* ¶¶ 145, 147. At a doctor's visit on September 23, 2019, Edison's doctor noted that he had lost 16% of his body weight since he was placed at Angel's Haven 2. *Id.* ¶ 148. This information

was communicated to Kotran on October 7, 2019. *Id.* Edison's doctor warned defendant Romero that she would call in a suspected child abuse referral if Angel's Haven 2 continued not to feed Edison adequately. *Id.* ¶ 149. On November 8, 2019, the County received a referral of suspected child abuse or neglect on a different child at Angel's Haven 2. *Id.* ¶ 151. When the investigative worker went to the home for a surprise visit, no one answered. *Id.* ¶ 152.

On November 20, 2019, Angel's Haven 2 staff texted Kotran to tell her Edison had been sent home from school "not feeling well" and suggesting that Kotran visit him. *Id.* ¶ 153. Kotran visited Edison on November 25. *Id.* ¶ 155. Staff told her that "he was home early from school due to feeling sick[,]" but Kotran did not follow up with further inquiry or suggest he see a doctor. *Id.* On December 4, 2019, Edison's teacher sent Kotran an email explaining that on November 20 Edison was sent home because he "sounded congested with lots of phlegm." *Id.* ¶ 156. Angel's Haven 2 insisted he was fine, and the school followed up with a referral that showed Edison had a viral upper respiratory infection. *Id.* Angel's Haven 2 sent him back to school the next day anyway. *Id.* Edison's teacher asked, "Any idea if he will be placed elsewhere anytime soon? I continue to believe it's not the best placement." *Id.* ¶ 157.

On the evening of December 7, 2019, Romero saw that Edison was vomiting and that he appeared unwell. *Id.* ¶ 158. Romero left Edison alone and unattended until 9:30 a.m. the next morning. *Id.* At some point between the evening of December 7 and the morning of December 8, 2019, Edison died of septicemia, "which was totally treatable with common antibiotics." *Id.* ¶ 160.

## II.    Procedural Background

On January 14, 2021, plaintiffs filed this suit in federal court. Dkt. No. 1. In May 2021, defendants Angel's Haven, a defunct business; Angel's Haven 2, a defunct business; Angel's Haven 3 Residential Care, a former California Corporation; Gabriel Tauro; and Maria Cecilia Tauro filed an answer and a cross-complaint against Contra Costa County. Dkt. Nos. 24, 25.

On June 14, 2021, the Court granted the parties' request to stay the case pending the release of Edison's case file records from the state juvenile dependency court. Dkt. No. 27. While the case was stayed, several of the individually named defendants filed answers, and plaintiffs voluntarily

United States District Court
Northern District of California

dismissed, without prejudice, a number of the individual defendants.

On June 2, 2023, the parties filed a status report indicating that three of plaintiffs' eight petitions for disclosure of juvenile case files had been ruled upon and records received.  Dkt. No. 85 at 4.  The parties requested that the stay be left in place but that limited discovery be permitted. *Id.* at 7.  The parties also requested that plaintiffs be granted leave to file their first amended complaint and that defendants be permitted to respond.  *Id.*  At a status conference the following week, the Court granted plaintiffs leave to file the FAC and gave defendants thirty days to respond. Dkt. No. 87.

On June 28, 2023, plaintiffs filed the FAC.  Dkt. No. 95.  Plaintiffs are: Edison Gatlin, a deceased minor, by and through his successors in interest, Clarissa Simms and Edward Gatlin; Clarissa Simms, an individual; and Edward Gatlin, an individual.  They bring suit against:

- Contra Costa County ("the County"); Craig Thurmond; Barbara Crespo; Christy Roland; Alexandria Kotran; Eleanor Walker; Kimberly Baker; Leslie Davis; Marcy Williamson; Kerissa Lynch; and Georgette Shipe (collectively, "County defendants");

- Valley Mountain Regional Center, Inc. ("VMRC"); Danielle Wells; Tracy Vaughn; and Julie De Diego (collectively, "VMRC defendants");

- Angel's Haven 2 Residential Care; Angel's Haven; Angel's Haven 3; Gabriel Tauro; and Maria Cecilia Tauro (collectively, "Angel's Haven defendants");

- individuals John Mark Rafael Romero; Marisse Casuco; and Jennifer Dillingham;

- Jenna-Ray Foster Family Home; and

- DOES 1 through 50.

The FAC brings seven claims for relief, four under federal law and three under state law:

(1) 42 U.S.C. § 1983 (Unwarranted medical examinations/procedures; exclusion of parents)—by plaintiffs, as successors in interest of Edison Gatlin, against Defendants Baker, Williamson, Thurmond, Shipe, Davis, Dillingham, Wells and DOES 1-10;

(2) 42 U.S.C. § 1983 (Failure to provide dependent minor continued safety, security,

United States District Court
Northern District of California

adequate care and supervision)—by plaintiffs, as successors in interest of Edison Gatlin, against all individual defendants;

(3) *Monell*-Related Claims—by plaintiffs, as successors in interest of Edison Gatlin, against Contra Costa County; Valley Mountain Regional Center, Inc.; and DOES 20 through 30;

(4) 42 U.S.C. § 1983 (Violation of Federal Statutory Mandates)—by plaintiffs, as successors in interest of Edison Gatlin, against Contra Costa County and each of its employee defendants;

(5) Breach of Mandatory Duties—by plaintiffs, individually and as successors in interest of Edison Gatlin, against Contra Costa County and each of its employee defendants and DOES 1 through 10;

(6) Negligence/Breach of Duties Imposed Under Special Relationship—by plaintiffs, individually and as successors in interest of Edison Gatlin, against all defendants;

(7) Wrongful Death, CCP § 377.60—by all plaintiffs and against defendants Contra Costa County, Kotran, Walker, Roland, Crespo, VMRC, Vaughn, De Diego, Angel's Haven 2, Gabriel Tauro, Maria Cecilia Tauro, John Mark Rafael Romero, and Marisse Casuco. Plaintiffs seek general and special damages of no less than $1 million, punitive damages, attorneys' fees, and costs.  FAC at 81.

After the filing of the FAC, the Court approved the parties' stipulations to extend the responsive pleading and hearing dates.  Dkt. Nos. 105, 108.  VMRC and County defendants have each moved to dismiss the FAC pursuant to Federal Rule of Civil Procedure 12(b)(6).  Dkt. Nos. 110 ("VMRC Mot."), 115 ("Cnty. Mot.").  The motions to dismiss came on for hearing on December 15, 2023.

## LEGAL STANDARD

Under Federal Rule of Civil Procedure 12(b)(6), a district court must dismiss a complaint if it fails to state a claim upon which relief can be granted.  To survive a Rule 12(b)(6) motion to dismiss, the plaintiff must allege "enough facts to state a claim to relief that is plausible on its face."

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  This "facial plausibility" standard requires the plaintiff to allege facts that add up to "more than a sheer possibility that a defendant has acted unlawfully."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  Although courts do not require "heightened fact pleading of specifics," *Twombly*, 550 U.S. at 544, a plaintiff must provide "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  *Id.* at 555.  The plaintiff must allege facts sufficient to "raise a right to relief above the speculative level."  *Id.*

In deciding whether the plaintiff has stated a claim, the Court must assume that the plaintiff's allegations are true and must draw all reasonable inferences in his or her favor.  *Usher v. City of Los Angeles*, 828 F.2d 556, 561 (9th Cir. 1987).  However, the Court is not required to accept as true "allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences."  *St. Clare v. Gilead Scis., Inc.*, 536 F.3d 1049, 1055 (9th Cir. 2008).  "[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions."  *Iqbal*, 556 U.S. at 678.

If the Court dismisses the complaint, it must then decide whether to grant leave to amend.  The Ninth Circuit has "repeatedly held that a district court should grant leave to amend even if no request to amend the pleading was made, unless it determines that the pleading could not possibly be cured by the allegation of other facts."  *Lopez v. Smith*, 203 F.3d 1122, 1130 (9th Cir. 2000) (citations and internal quotation marks omitted).

## DISCUSSION

### I.      County Defendants' Motion

County defendants argue that the majority of the claims are barred by the statute of limitations; that plaintiffs have not alleged the specific policy, practice or custom in support of the *Monell* claim; and that the FAC does not adequately allege facts showing deliberate indifference, in support of the federal claims, or the violation of a breach of duty, in support of the state law negligence claims.  They also argue that most of the County defendants are immune from liability for the roles they played in placing Edison in a home and in investigating issues related to his care.

9

1   Cnty. Mot. at 1.

2

3         **A.     Qualified Immunity (First and Second Claims)**

4         County Defendants argue that plaintiffs' First and Second Claims, brought under 42 U.S.C.

5   § 1983 against various individual defendants, are barred by qualified immunity.  A court considering

6   a claim of qualified immunity must determine whether the plaintiff has: (1) alleged the deprivation

7   of an actual constitutional right, and (2) whether such right was clearly established such that it would

8   be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.  *See*

9   *Pearson v. Callahan*, 555 U.S. 223, 232 (2009) (citing *Saucier v. Katz*, 533 U.S. 194, 201 (2001)).

10   Of the two-pronged analysis, County defendants argue that plaintiffs have not shown the violation

11   of a constitutional right.  *See* Cnty. Mot. at 11.

12         Regarding this first prong, the threshold question must be: Taken in the light most favorable

13   to the party asserting the injury, do the facts alleged show the defendant's conduct violated a

14   constitutional right?  *Saucier*, 533 U.S. at 201; *see also Martin v. City of Oceanside*, 360 F.3d 1078,

15   1082 (9th Cir. 2004) (in performing the initial inquiry, court is obligated to accept plaintiff's facts

16   as alleged, but not necessarily his application of law to the facts; the issue is not whether a claim is

17   stated for a violation of plaintiff's constitutional rights, "but rather whether the [defendants] *actually*

18   violated a constitutional right").

19

20         **1.     Unwarranted Medical Examinations/Procedures; Exclusion of Parents**

21                 **(First Claim)**

22         The First Claim of the FAC pertains to Edison's medical care and the related exclusion of

23   his parents.  County defendants "agree as a general matter that a child has the right to the love,

24   comfort, and reassurance of his parents when undergoing certain medical procedures, including

25   examinations, particularly those that may be invasive or upsetting."  *See* Cnty. Mot. at 11-12 (citing

26   *Mann v. County of San Diego*, 907 F.3d 1154, 1160-61 (9th Cir. 2018); *Wallis v. Spencer*, 202 F.3d

27   1126, 1142 (9th Cir. 2000)).  County defendants simply disagree that right applies under the facts

28   here.

United States District Court
Northern District of California

The Court need not reach the parties' dispute about whether or not the right at issue extends beyond invasive or upsetting medical procedures, as the FAC here has alleged several invasive procedures from which Edison's parents were excluded, including one that occurred before any court order appeared to be in place:[1] Edison's shunt revision surgery in January 2015 and his surgery to place a gastrostomy tube in April 2015. *See* FAC ¶¶ 76-77, 175.

As to the January 2015 surgery, the FAC alleges that the surgery took place on a non-emergency basis, "without notice or consent of his parents[,]" on the authorization of defendants Thurmond, David, Shipe, and DOES 1-5. *Id.* ¶ 76. The FAC further alleges, "At no point in time was a court order authorizing the surgery sought or obtained. When Clarissa discovered Edison was to have the surgery Clarissa attempted to enter the hospital to provide Edison care, comfort, and support both during and after this extremely invasive and potentially traumatic event. However, on information and belief, at [defendants Thurmond, Davis, Shipe and DOES 1-5's] instructions, she was excluded with no lawful or legitimate basis for the exclusion." *Id.*

As to the April 2015 gastrostomy tube surgery, the FAC alleges that County defendants Shipe, Davis, and DOES 1-10 did inform Edison's parents in advance of the County's intent to authorize Edison to undergo surgery. *Id.* ¶ 174. Edison's parents objected to the proposed surgery, prompting Shipe to seek court authorization. *Id.* The court granted authorization for the surgery, but Shipe did not ask, and the court did not order, that Edison's parents be excluded. *Id.* ¶¶ 174-175. Nevertheless, plaintiffs allege that Shipe, Davis, and DOES 1-10 "intentionally excluded Edison's parents from the hospital during and after the surgery, on April 23, 2015, such that Edison was precluded from receiving their comfort, care, and support during the invasive and traumatic procedure, and during the concomitant recovery period." *Id.* ¶ 175.

To summarize, the Court finds that the First Claim of the FAC adequately states a violation

---

[1] County defendants ask the Court to take judicial notice of a state court order that they say granted the County authority over Edison's medical care. *See* Dkt. No. 116-1, Cnty. Req. Jud. Not., Ex. A. The Court GRANTS judicial notice of the undisputed fact that the court order is dated March 25, 2015. At this time, the Court DENIES the request for judicial notice of the record for any other purpose, particularly for the purpose County defendants seek to prove, i.e., who had authority over Edison's medical care. *See* Fed. R. Evid. 201(b).

of a constitutional right, in that County defendants denied Edison his "right to the love, comfort, and reassurance of [his] parents while . . . undergoing medical procedures, . . . particularly those, such as here, that are invasive or upsetting." *See Wallis*, 202 F.3d at 1142.  The FAC plausibly alleges that the County submitted Edison to surgeries from which his parents were excluded, without a court order calling for their exclusion.[2]

The Court DENIES County defendants' motion to dismiss the First Claim.

### 2.      Failure to Provide Dependent Minor Continued Safety, Security, Adequate Care and Supervision (Second Claim)

As to the Second Claim, County defendants argue that the FAC fails to allege "conduct that shocks the conscience to state a claim for deliberate indifference."  Mot. at 13.  They accuse plaintiffs of "cherry-pick[ing]" instances to paint an inaccurate picture of Edison's care over the course of five years in County custody.

In the Ninth Circuit,

> the proper standard for determining whether a foster child's due process rights have been violated is 'deliberate indifference' . . . This standard requires an objective risk of harm and a subjective awareness of that harm. . . .  To be more specific, it requires (1) a showing of an objectively substantial risk of harm; and (2) a showing that the officials were subjectively aware of facts from which an inference could be drawn that a substantial risk of serious harm existed and (a) the official actually drew that inference or (b) that a reasonable official would have been compelled to draw that inference. . . .  [T]he subjective component may be inferred from the fact that the risk of harm is obvious.

*Henry A. v. Willden*, 678 F.3d 991, 1000-01 (9th Cir. 2012) (citing *Tamas v. Dep't of Social &*

---

[2] Elsewhere in their motion, County defendants characterize the dispute as whether Edison's parents "had a constitutional right to authorize all medical treatment for Edison."  *See* Cnty. Mot. at 12.  But they appear to misconstrue the claim as one asserted on behalf of the parents.  *See id.* ("The right at issue belonged to Edison—not his parents").  The FAC makes clear the parents bring this claim on Edison's behalf, as his successors in interest.  *See* FAC at 40.  The Court thus does not reach this argument.

County defendants also make the shocking argument that the right to parental comfort during certain medical procedures did not apply to Edison because, as a severely disabled child with intellectual disabilities, "Edison was incapable of exercising that right, and . . . he could not have requested his parents' presence at his various procedures."  *See* Cnty. Mot. at 12.  The Court will not credit this argument with a response.

United States District Court
Northern District of California

1    *Health Servs.*, 630 F.3d 833, 844-45 (9th Cir. 2010)) (internal quotation marks omitted).

2           The Court finds that several of the allegations of the FAC would suffice to meet the

3    deliberate indifference standard.   These include the allegations: that despite Edison's severe

4    disabilities, the County did not put any type of "plan" in place to address his substantial medical and

5    service needs for approximately nine months after taking him into custody; and that the County

6    repeatedly placed him in homes where it would have been obvious to any reasonable person that the

7    homes were not equipped to care for Edison, particularly in light of the regional center's finding

8    that he required 24/7 one-on-one care and supervision, to name a few.

9           That said, it is not clear from the FAC under which theory/theories plaintiffs pursue their

10   Second Claim.   The Ninth Circuit has explained that there are two exceptions to the general rule

11   that the Fourteenth Amendment of the U.S. Constitution does not confer an "affirmative right to

12   governmental aid" and "does not impose a duty on the state to protect individuals from third parties."

13   *Henry A.*, 678 F.3d at 998 (quoting *Patel v. Kent Sch. Dist.*, 648 F.3d 965, 971 (9th Cir. 2011)).   The

14   first is the "special relationship exception": "when a custodial relationship exists between the

15   plaintiff and the State such that the State assumes some responsibility for the plaintiff's safety and

16   well-being." *Id.* (citations omitted).   The second is the "state-created danger exception": "when the

17   state affirmatively places the plaintiff in danger by acting with 'deliberate indifference' to a 'known

18   and obvious danger[.]'" *Id.* (citations omitted).

19          Here, plaintiffs label the Second Claim as if it falls under the "special relationship exception"

20   but they also add in allegations speaking to a state-created danger exception.  *See* FAC ¶¶ 194-195.

21   Courts analyze the two exceptions under different legal standards.   Thus, it is difficult for this Court

22   to analyze, much less for defendants to defend themselves, without clearly knowing the basis for

23   the Second Claim.   For instance, the former exception would govern claims regarding inadequate

24   health care that the County provided while Edison was in foster care; the latter exception would

25   govern allegations regarding "placing [Edison] in a home where there is a known danger of abuse."

26   *See Henry A.*, 678 F.3d at 1001, 1003 (citing *Tamas*, 640 F.3d at 843-44).

27          The Court will therefore GRANT the motion to dismiss the Second Claim, with leave to

28   amend, so that plaintiffs may clarify the grounds for this claim.   In amending, plaintiffs shall clearly

United States District Court
Northern District of California

13

United States District Court
Northern District of California

state whether the claim is brought under the "special relationship exception" to the Due Process Clause of the Fourteenth Amendment, or under the "state-created danger exception," or both.  The claim shall clearly identify which defendants are alleged to have committed the violation(s) and shall state the facts in support.  The Court cautions plaintiffs that "in any future proceedings in the district court, each defendant's liability [will] be analyzed individually using the proper standard, whether that individual is a line-level caseworker, a supervisory official, or a municipality."  *Henry A.*, 678 F.3d at 1005 (citing *Tamas*, 630 F.3d at 847) (remanding with instructions that plaintiffs be allowed to amend their substantive due process claims, where the complaint did not adequately tie some of the factual allegations to particular defendants).[3]

### B.    *Monell* (Third Claim)

County defendants move to dismiss the Third Claim, which plaintiffs bring against the County and VMRC pursuant to *Monell v. Dep't of Social Servs.*, 436 U.S. 658 (1978).

Local governments are "persons" subject to liability under 42 U.S.C. § 1983 where official policy or custom causes a constitutional tort, *see Monell*, 436 U.S. at 690; however, a city or county may not be held vicariously liable for the unconstitutional acts of its employees under the theory of *respondeat superior.  See Board of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 403 (1997); *Monell*, 436 U.S. at 691; *Fuller v. City of Oakland*, 47 F.3d 1522, 1534 (9th Cir. 1995).  To establish an official policy that would give rise to *Monell* liability, a plaintiff must allege facts to support one of the following to survive dismissal of his claim: (1) an unconstitutional custom or policy behind the violation of rights; (2) a deliberately indifferent omission, such as a failure to train or failure to have a needed policy; or (3) a final policy-maker's involvement in, or ratification of, the conduct underlying the violation of rights.  *Clouthier v. County of Contra Costa*, 591 F.3d 1232,

---

[3] County defendants argue for the first time in their reply brief that the FAC fails to establish proximate cause as to the individual County defendants named in the First and Second Claims.  *See* Dkt. No. 122 ("Cnty. Reply") at 3-8.  The reply then goes through a defendant-by-defendant analysis of whether the allegations suffice as to each.

In general, the Court will not consider arguments first raised in a reply brief.  Nevertheless, as the Court is dismissing this claim with leave to amend, County defendants may re-raise this argument at a later stage of the proceedings, if warranted.

1249-50 (9th Cir. 2010) (synthesizing authorities), *overruled on other grounds by Castro v. County of Los Angeles*, 833 F.3d 1060 (9th Cir. 2016).

With regard to the policy or custom/practice theory, proof of random acts or isolated incidents of unconstitutional action by a non-policymaking employee is insufficient to establish the existence of a municipal policy or custom. *See Rivera v. County of Los Angeles*, 745 F.3d 384, 398 (9th Cir. 2014); *McDade v. Wes*t, 223 F. 3d 1135, 1142 (9th Cir. 2000); *Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir. 1996). While the Ninth Circuit has explained that "[a] single constitutional deprivation ordinarily is insufficient to establish a longstanding practice or custom[,]" courts have also noted that "[i]t is difficult to discern from the caselaw the quantum of allegations needed to survive a motion to dismiss a pattern and practice claim." *See Christie v. Iopa*, 176 F.3d 1231, 1235 (9th Cir. 1999) (citing *Trevino*, 99 F.3d at 918); *Gonzalez v. County of Merced*, 289 F. Supp. 3d 1094, 1099 (E.D. Cal. 2017). Following the Supreme Court's decision in *Iqbal*, the Ninth Circuit has clarified that for a *Monell* claim to survive a motion to dismiss, the complaint (1) "may not simply recite the elements of a cause of action but must contain sufficient allegations of underlying facts to give fair notice and to enable the opposing party to defend itself effectively" and (2) "the factual allegations that are taken as true must plausibly suggest an entitlement to relief, such that it is not unfair to require the opposing party to be subjected to the expense of discovery and continued litigation." *AE ex rel. Hernandez v. County of Tulare*, 666 F.3d 631, 637 (9th Cir. 2012) (quoting *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011)).

Here, the FAC alleges three "counts" of *Monell* violations. Count 1 relates to medical care and the exclusion of parents from medical decisions/treatment involving their children who are in County custody. Specifically, the FAC alleges that at the time of the underlying events Contra Costa County had the following regularly established policies that caused Edison harm:

       a.     The policy of subjecting children to unwarranted, non-consensual, and nonemergency medical examinations and/or evaluations and/or procedures/treatments.

       b.     The policy of refraining from notifying parents that non-emergency medical examinations and/or evaluations and/or procedures/treatments will be performed on their child.

c.    The policy of excluding a child's parents from medical decision making when there is no authorizing court order and/or when there is no legitimate basis to do so.

d.    The policy of excluding a child's parents from attending and/or being present for a child's non-emergency medical examinations and/or evaluations and/or procedures/treatments when there is no authorizing court order and/or when there is no legitimate basis for the exclusion.

e.    The policy of acting with deliberate indifference to the rights of the children with whom Contra Costa County's agents can regularly be expected to come into contact by failing and/or refusing to implement a practice of regular and adequate training and/or supervision, and/or by failing to train and/or supervise its agents and/or employees to ensure compliance with constitutional mandates including those arising under the First, Fourth, and Fourteenth Amendments, when performing actions related to child abuse Investigations.

FAC ¶ 225. The FAC further alleges that Contra Costa County had a custom/practice of taking the same above named actions, and that the County failed to train its staff on the constitutional rights of children related to the above. *Id.* ¶¶ 226, 230.

In Count 2, plaintiffs allege the County had customs and/or practices that failed to protect children in custody from harm. These include customs and/or practices of: failing to assess the services needs of children promptly after taking them into custody; placing children without first assessing the particular placement's capabilities to meet the child's known needs; maintaining foster children in placements known or suspected to be inadequate to the child's needs; failing to provide minimally adequate care, including health care, to children in County custody who have severe physical health issues and/or who are severely disabled; and acting with deliberate indifference in implementing a practice of adequate training and/or supervision and/or by failing to train its staff.[4] *Id.* ¶ 238.

County defendants argue that the *Monell* claim fails because "the FAC fails to identify a specific County policy, practice, or custom that may have caused the deprivation of any of Plaintiffs'

---

[4] Count 3 of the Third Claim pertains to VMRC, and the Court addresses this count in Section II, below.

constitutional rights . . . ."  Cnty. Mot. at 16.  They generally argue that the allegations are no more than conclusory.

### 1.    Count 1: Medical Care

The Court finds the allegations are sufficiently stated with regard to the County's policy or custom regarding the medical care of children in County custody.  *See* FAC ¶¶ 225(a)-(d), 226(a)-(d).  In Edison's case alone, the FAC alleges a number of these incidents.  Plaintiffs allege that various of the County defendants authorized non-emergency medical care for Edison without his parents' knowledge/consent and without a court order on September 23, October 6, October 17, November 3, November 4, November 7, November 19, November 21, and December 5, 2014; and on February 5, February 6, February 20, March 13, and March 19, 2015.  *Id.* ¶¶ 74, 165-172.  The same happened for Edison's younger sisters on December 3, 2014.  *Id.* ¶ 75.  In January 2015, Edison's case workers took him to the hospital for non-emergent shunt revision surgery, without a court order, without notice to or consent from his parents, and without allowing his mother to be present at the surgery.  *Id.* ¶ 76.  The Court notes that all of these instances took place *before* the March 25, 2015 court order that the County says gave it authority over Edison's medical care.  *See* n.1, *supra*.  These allegations, which are not conclusory, suffice to show at this stage that the County had a policy or custom of obtaining non-emergency medical care for foster children without notice to the parents and/or without allowing the parents to be present or to participate in the medical decisionmaking.

However, the Court finds that the policy/custom stated in paragraphs 225(e) and 226(e) of the FAC are insufficient "to give fair notice and to enable the opposing party to defend itself effectively."  *See AE ex rel. Hernandez*, 666 F.3d at 637 (citation omitted).  This portion of the FAC alleges that the County had a policy or custom/practice "of acting with deliberate indifference to the rights of children" by failing to train staff on ensuring compliance with constitutional protections "when performing actions related to child abuse investigations."  *See* FAC ¶¶ 225(e), 226(e).  The FAC lists this allegation under the heading of "Unwarranted Non-Consensual Medical Examination/Treatments/Procedures; Exclusion of Parents."  *See id.* at 55.  It is unclear how the

failure to train staff on child abuse investigations relates to this topic.  Moreover, the FAC is vague as to which "rights of children" were disregarded.

The Court will not separately analyze the related failure to train theories but finds that the *Monell* claims in Count 1 may proceed on the allegations in the FAC ¶¶ 225(a)-(d) and 226(a)-(d), for the reasons stated above.  *See Quinto-Collins v. City of Antioch*, No. 21-cv-06094-VC, 2022 WL 18574, at *2 (N.D. Cal. Jan. 3, 2022) ("generally speaking, when a plaintiff makes two different arguments in support of one basis for relief, the plaintiff is not bringing two separate claims. . . .  In the context of *Monell*, the different theories of liability (e.g., ratification, failure to train) are best understood the same way—as different arguments in support of a single claim.").

Accordingly, the motion to dismiss Count 1 of the Third Claim is GRANTED as to the allegations in FAC ¶¶ 225(e) and 226(e), with leave to amend.  The motion is DENIED as to the allegations in FAC ¶¶ 225(a)-(d) and 226(a)-(d).

### 2.     Count 2: Failure to Protect

With regard to the allegations in Count 2, the Court finds that they are insufficiently pled either because they are too vague and/or because the FAC does not allege more than one incident, and so there can be no claim of an unconstitutional county-wide practice or custom.  For instance, Count 2 alleges the County has a "custom and/or practice of failing to assess the particular service needs of children promptly after being taken into custody[.]"  FAC ¶ 238(a).  But the FAC describes only the singular incident where Edison was initially taken into custody and did not receive an assessment; it does not provide any information about other children being taken into custody and whether the County also failed to assess their needs promptly.  This isolated allegation will not suffice to show a custom or practice.  *See Bagley v. City of Sunnyvale*, No. 16-CV-02250-JSC, 2017 WL 5068567, at *5 (N.D. Cal. Nov. 3, 2017) ("Where courts have allowed *Monell* claims to proceed at the motion to dismiss stage, plaintiffs have pled multiple incidents of alleged violations.").  Further, Count 2 points to the County's alleged widespread failure "to provide even minimally-adequate care, including health care" and failure to train staff "in providing the constitutional protections guaranteed to individuals . . . when performing actions related to the placement of foster

18

children and the investigation and reporting of child neglect and abuse, and the provision of reasonably-adequate care[.]" FAC ¶ 238(d)-(e).  As alleged, Count 2 is conclusory and too vague "to give fair notice" to County defendants of the alleged violations.  *See AE ex rel. Hernandez*, 666 F.3d at 637 (citation omitted).

Accordingly, the Court GRANTS the motion to dismiss Count 2 of the Second Claim, with leave to amend.

### C.     Federal Child Welfare Statutes (Fourth Claim)

County defendants also move to dismiss the Fourth Claim, labeled "42 U.S.C. § 1983 – Violation of Federal Statutory Mandates."  They argue that the claim is vague and ambiguous and that certain of the child welfare statutes plaintiffs cite do not provide a private right of action.

#### 1.     Legal Standard

The Supreme Court has explained that Section 1983 "safeguards certain rights conferred by federal statute."  *Blessing v. Freestone*, 520 U.S. 329, 340 (1997) (citing *Maine v. Thiboutot*, 448 U.S. 1 (1980)).  To seek redress, however, "a plaintiff must assert the violation of a federal *right*, not merely a violation of federal *law*."  *Id.* (citation omitted).  To determine whether a particular statutory provision gives rise to a federal right, courts apply the three-factor "*Blessing* test."  *See id.* at 340-41.  "The *Blessing* test requires: 1) that Congress intended the statutory provision to benefit the plaintiff; 2) that the asserted right is not so 'vague and amorphous' that its enforcement would strain judicial competence; and 3) that the provision couch the asserted right in mandatory rather than precatory terms."  *Watson v. Weeks*, 436 F.3d 1152, 1158 (9th Cir. 2006) (citing *Blessing*, 520 U.S. at 340-41).

#### 2.     Analysis

At the outset, the Court agrees with County defendants that the Fourth Claim is so filled with statutory references that it is unclear precisely which statutes plaintiffs sue to enforce here.  At the hearing, plaintiffs clarified that they seek to enforce Edison's rights under the following provisions

United States District Court
Northern District of California

of the federal Adoption Assistance and Child Welfare Act ("CWA"), 42 U.S.C. § 670 et seq.: Sections 671(a)(16) and 675(1) – regarding case plans; and, read together, Section 671(a)(19) and (a)(29)– regarding placement preference with an adult relative and kinship notification.[5]  Although the FAC also cites to 42 U.S.C. § 671(a)(15), regarding permanency planning, plaintiffs state in their brief that they are not seeking direct enforcement of this statute.  *See* Dkt. No. 119 ("Opp'n to Cnty. Mot.") at 21-22.   To the extent that the Court is allowing plaintiffs to amend certain allegations, the Court advises plaintiffs to clarify *precisely which statutes* they rely on in the Fourth Claim.  Still, the Court will analyze the claims as to those statutes plaintiffs identified in their brief and at the hearing.

### a.    Case Planning

The Ninth Circuit has held that the case plan provisions of the CWA, codified at 42 U.S.C. §§ 671(a)(16) and 675(1), are privately enforceable via Section 1983.  *Henry A.*, 678 F.3d at 1008. The parties do not dispute this.  Instead, County defendants argue that plaintiffs have not sufficiently alleged facts showing that County defendants violated these provisions.

The Court agrees that the FAC does not provide sufficient detail to plausibly allege a violation of the case plan provisions.  The FAC states that County defendants failed "to promptly craft a case plan" and "failed to promptly and/or properly implement and enforce case plans that they did finally create . . . ."  *Id.* ¶¶ 260-261.  But the FAC does not say when the case plan was ultimately created, nor does it elaborate on which parts of the case plan(s) were not implemented and enforced.  "Case plan" as defined in 42 U.S.C. § 675(1) involves many components—such as a requirement that specific health records be included, as well as a plan for ensuring the child's educational stability while in foster care—and the FAC provides no detail regarding which pieces of the case plan County defendants failed to provide.  In their opposition brief, plaintiffs clarify that the reference to "case plans" in paragraph 261 is not actually a reference to case plans as

---

[5] These provisions of the CWA "are spending statutes[.]"  *See Henry A.*, 678 F.3d at 1006. Public child welfare agencies "agree[] to administer [their] foster care systems in accordance with these federal laws in return for financial assistance from the government."  *Id.*

United States District Court
Northern District of California

1    contemplated by the CWA; rather, they argue for the first time that "it is not apparent that the *County*

2    Defendants *ever* created a case plan that complies with 675(1)." *See* Opp'n to Cnty. Mot. at 20-21.

3    None of this is clear from the FAC.

4        The Court will therefore GRANT the motion to dismiss the case planning portion of the

5    Fourth Claim, with leave to amend to clarify the factual allegations.

6

7                    **b.    Kinship Notification and Adult Relative Preference**

8        At the hearing, plaintiffs stated that they also bring a separate claim for enforcement of the

9    kinship notification and adult relative preference statutes, under 42 U.S.C. § 671(a)(19), (a)(29).

10   Section 671(a)(19) says that in order to be eligible for federal financial assistance under the CWA,

11   a state must have a plan (i.e., "the State plan")[6] which: "provides that the State shall consider giving

12   preference to an adult relative over a non-related caregiver when determining a placement for a

13   child, provided that the relative caregiver meets all relevant State child protection standards[.]"

14   Section 671(a)(29) requires that the State plan "provide[] that, within 30 days after the removal of

15   a child from the custody of the parent or parents of the child, the State shall exercise due diligence

16   to identify and provide notice to the following relatives: all adult grandparents, all parents of a

17   sibling of the child, . . . and other adult relatives of the child (including any other adult relatives

18   suggested by the parents) . . . ." 42 U.S.C. § 671(a)(29).

19       The Ninth Circuit has not spoken on whether these provisions of the CWA confer a private

20   right of action, and plaintiffs point to no case in which a court has found that they do. As indicated

21   at the hearing, the Court has reservations about whether these provisions meet the *Blessing* test.

22   However, the Court will not reach this question because it agrees with County defendants that the

23   factual allegations of the FAC are conclusory in this regard. The FAC alleges that, on information

24

25       ⁶ As explained by the Sixth Circuit, to be eligible for federal child welfare funding, "a state
26   must submit a plan to the Secretary of Health and Human Services that satisfies thirty-five specific
     criteria. 42 U.S.C. § 671(a). If a state's plan fails to 'substantial[ly] conform[ ]' to the Act's
27   requirements, *id.* § 1320a-2a, the Secretary, after giving the state an opportunity to implement a
     corrective action plan, must withhold federal money, *id.* § 1320a-2a(b)(3)(A), (4)(A)." *D.O. v.*
28   *Glisson*, 847 F.3d 374, 376 (6th Cir. 2017).

United States District Court
Northern District of California

and belief, defendants Baker, Williamson, and Thurmond refrained from conducting the required relative search when Edison was taken into foster care. FAC ¶ 273. Plaintiffs further allege, "At that time, had the required search been undertaken, it would have been discovered that Edison had multiple qualified relatives capable of meeting his care needs who were ready, willing, and able to accept the responsibility to care for him." *Id.* The FAC is silent as to the identity of these relatives, which is information that should be readily available to Edison's parents, who are plaintiffs in this case. The FAC further states that years passed and Edison's parents eventually got Edison's three siblings back. *Id.* The FAC does not say whether any of Edison's siblings were ever placed with an approved adult relative. And even if they were, that would not answer the question of whether there were adult relatives who were willing and able to accept responsibility for a child with the serious level of medical and supervision needs that Edison had.

For these reasons, the Court GRANTS the motion to dismiss the relative placement/kinship notification portion of the Fourth Claim, with leave to amend to clarify the factual allegations.

### D.   Breach of Mandatory Duties (Fifth Claim)

#### 1.   Mandatory Duty

Under the California Government Tort Claims Act, a public entity is not liable for any injury except as provided by statute. Cal. Gov't Code § 815. The intent of the California Tort Claims Act is not to expand a plaintiff's right to bring suit against public entities, but to "confine potential governmental liability to rigidly delineated circumstances[.]" *In re Groundwater Cases*, 154 Cal. App. 4th 659, 688 (2007) (*quoting Williams v. Horvath*, 16 Cal.3d 834, 838 (1976)). Since sovereign immunity is the rule in California, a public entity "may be held liable only if there is a statute subjecting [it] to civil liability." *Id.* Without such a statute, the public entity is immune from suit. *Id.*

California Government Code § 815.6[7] allows a plaintiff to sue a public entity for a particular

---

[7] California Government Code § 815.6 reads:

Where a public entity is under a mandatory duty imposed by an enactment that is designed to protect against the risk of a particular kind of injury, the public entity is

type of injury where the public entity had a mandatory duty to protect against the risk of that injury. "A plaintiff seeking to hold a public entity liable under Government Code section 815.6 must specifically identify the statute or regulation alleged to create a mandatory duty." *In re Groundwater Cases*, 154 Cal. App. 4th at 689 (citation omitted). To establish whether liability may be imposed on a public entity, the following must be met: (1) the enactment in question must impose a mandatory, not discretionary, duty; (2) the enactment must be intended to protect against the kind of risk of injury suffered by the party asserting the statute as the basis of liability; and (3) the breach of duty must be a proximate cause of the plaintiff's injury. *Id.* (citing *Ibarra v. California Coastal Comm'n*, 182 Cal. App. 3d 687, 692-93 (1986)). Whether an enactment creates a mandatory duty is a question of law. *Haggis v. City of Los Angeles*, 22 Cal.4th 490, 499 (2000).

To interpret an enactment as imposing a mandatory duty on a public entity, "the mandatory nature of the duty must be phrased in explicit and forceful language." *Collins v. Thurmond*, 41 Cal. App. 5th 879, 914 (2019) (*quoting Quackenbush v. Superior Court*, 57 Cal. App. 4th 660, 663 (1997)). "It is not enough that some statute contains mandatory language. In order to recover plaintiffs have to show that there is some *specific* statutory mandate that was violated by the [public entity] ... ." *In re Groundwater Cases*, 154 Cal. App. 4th at 689 (*quoting Washington v. County of Contra Costa*, 38 Cal. App. 4th 890, 896-97 (1995)). "[T]he enactment at issue [must] be obligatory, rather than merely discretionary or permissive, in its directions to the public entity; it must require, rather than merely authorize or permit, that a particular action be taken or not taken." *Haggis*, 22 Cal.4th 498. Moreover, "the enactment allegedly creating the mandatory duty must impose a duty on the specific public entity sought to be held liable." *In re Groundwater Cases*, 154 Cal. App. 4th at 689.

County defendants argue, and the Court agrees, that the allegations of the Fifth Claim are vague. The claim asserts a long list of violations against the County and against each of the ten individual County defendants, without distinguishing which violations are asserted against whom.

liable for an injury of that kind proximately caused by its failure to discharge the duty unless the public entity establishes that it exercised reasonable diligence to discharge the duty.

Plaintiffs assert that these defendants "continuously violated mandatory duties including, but not limited to, those set forth in regulations in the California Department of Social Services (CDSS) Manual of Policies and Procedures (MPP) established pursuant to Welfare & Institutions Code §16501 and as set forth in Contra Costa County's Department of Children and Family Services Handbook and Penal code section 11164-11166." FAC ¶ 278. The Fifth Claim alleges violations of roughly seventeen regulations and then goes on to list twenty different types of violations, citing a mix of various regulations and statutes. *See id.* ¶¶ 278-282. Plaintiffs' opposition then cites to a handful of paragraphs from the FAC's factual background allegations, apparently in an attempt to clarify that those facts form the basis of this claim, though the Fifth Claim does not say so specifically. *See* Opp'n to Cnty. Mot. at 22. Plaintiffs bring the Fifth Claim on behalf of themselves both individually and as successors in interest to Edison.

Even reading the FAC as a whole, there are not facts to support plaintiffs' theory that each one of the County defendants violated each one of the "mandatory duties" listed, against both Edison and against his parents. The claim as written is so broad that it does not fairly put defendants on notice of what they are to defend. The Court GRANTS the motion to dismiss the Fifth Claim, with leave to amend.

### 2. Statute of Limitations

Moreover, the Fifth Claim is vague as to the timeline of various events alleged. County defendants initially moved to dismiss many of the allegations in the FAC as falling outside the statute of limitations. In their reply brief, County defendants concede that their argument fails regarding the timeliness of plaintiffs' federal claims. Cnty. Reply at 2. County defendants maintain, however, that the Fifth Claim is time-barred, "to the extent it is based on acts occurring more than six months before [plaintiffs] filed a claim with the County as required by the CGCA [California Government Claims Act] . . . ." *Id.* They argue that California Government Code Section 911.2 requires the filing of a CGCA claim within six months after the cause of action accrues. They ask the Court to take judicial notice of records showing, *inter alia*, that plaintiffs first presented their claims to the County under the CGCA on June 3, 2020. Cnty. Mot. at 8 (citing Cnty Req. for Jud.

Not., Ex. B).[8]  County defendants say the lack of specificity with regard to the timing of events alleged in the Fifth Claim make it impossible to discern whether these allegations are within the CGCA statute of limitations.

Plaintiffs argue that California Government Code Section 911.4(c)(2)-(3) undermines the County's position because that statute alters the timeline for children who are dependents of the court.  County defendants do not address this argument in the reply brief.

The Court is cognizant that under Federal Rule of Civil Procedure 12(b)(6), a claim may be dismissed based on the statute of limitations only when "the running of the statute is apparent on the face of the complaint."  *See Von Saher v. Norton Simon Museum of Art at Pasadena*, 592 F.3d 954, 969 (9th Cir. 2010) (quoting *Huynh v. Chase Manhattan Bank*, 465 F.3d 992, 997 (9th Cir. 2006)).  And here, it is not apparent from face of the complaint that the Fifth Claim is untimely.  A review of the Fifth Claim shows that some allegations are clearly tied to certain facts alleged elsewhere in the complaint, and so the timeframe can be inferred (for instance, the failure to develop a case plan within 30 days of Edison's removal from his mother's home, *see* FAC ¶ 279).  For other allegations, though, the FAC does not provide adequate detail regarding the events for defendants to be on notice of when the event is alleged to have occurred (for instance, the allegation that the County failed to arrange visits between Edison and his parents no less frequently than once each calendar month, *see* FAC ¶ 282(j)).

As the Court is already dismissing the Fifth Claim with leave to amend, *see* § I.D.1, *supra*, the Court advises plaintiffs to plead the relevant dates for the Fifth Claim with greater specificity.[9]

---

[8] The Court DENIES County defendants' request for judicial notice of Exhibit B, without prejudice.  *See* Dkt. No. 116-2.  The Court does not rely on this document in making today's ruling.

[9] Given the deficiencies of the Fifth Claim, the Court reserves ruling on the parties' arguments that County defendants breached their mandatory child abuse reporting duties and that County defendants are immune from suits that are based on an alleged botched investigation or failure to investigate.  The parties may raise these arguments again once plaintiffs have clarified which plaintiffs are suing which defendants, for violations of which laws, and based on which facts.

United States District Court
Northern District of California

United States District Court
Northern District of California

### E.      Remaining State Law Claims

Plaintiffs' Sixth Claim is for "Negligence/Breach of Duties Imposed Under Special Relationship," against all defendants.  In their motion, County defendants argue that "common law negligence claims cannot be maintained against the County" except as otherwise provided by statute. Cnty. Mot. at 20.  County defendants likewise move to dismiss the Seventh Claim for wrongful death, arguing that it hinges on the validity of the Sixth Claim for negligence.  *Id.* at 21.

In opposition, plaintiffs point out that the Sixth Claim seeks to hold the County liable on the theory that "[t]he entity Defendants, and each of them, are vicariously responsible for the conduct of each of their respective employees under Government Code Section 815.2 . . . ."  *See* FAC ¶ 297. A public entity may be subject to respondeat superior liability under § 815.2 for injury caused by an act or omission of an employee.[10]   Cal. Gov't Code § 815.2(a); *see also Mayfield v. County of Merced*, No. CV F 13-1619, 2014 U.S. Dist. LEXIS 79066, at *21 (E.D. Cal. June 6, 2014) (noting § 815.2 provides for respondeat superior liability for an employee's act or omission).   County defendants do not address this argument further in their reply brief.  The Court will allow the Sixth and Seventh Claims to go forward and thus DENIES County defendants' motion to dismiss these claims.

## II.      VMRC Defendants' Motion

VMRC defendants move to dismiss the Second and Third Claims.  They first argue that neither the entity VMRC nor the individual VMRC defendants were "state actors," as is required for Section 1983 liability. They also argue that plaintiffs have not pleaded facts showing VMRC defendants deprived Edison of any constitutional rights that VMRC defendants had a duty to protect.

---

[10] California Government Code § 815.2 states the following:

(a) A public entity is liable for injury proximately caused by an act or omission of an employee of the public entity within the scope of his employment if the act or omission would, apart from this section, have given rise to a cause of action against that employee or his personal representative.

(b) Except as otherwise provided by statute, a public entity is not liable for an injury resulting from an act or omission of an employee of the public entity where the employee is immune from liability.

As to the *Monell* claim (Third Claim), they state this claim pleads insufficient facts.  They then argue that because the federal claims should be dismissed, the Court should decline to exercise supplemental jurisdiction over the remaining state law claims.  In their reply brief, VMRC defendants state that, "[a]pparently due to an oversight, . . . it was not specifically argued in the moving papers that VMRC Defendant Wells is also entitled to dismissal from the First Claim for Relief."  Dkt. No. 121 ("VMRC Reply") at 14.  They argue that the First Claim should be dismissed as to Wells for the same reasons argued elsewhere in their papers: that Wells was not acting under color of state law nor did she violate Edison's constitutional rights.

### A.    Acting Under Color of State Law

If VMRC defendants are correct that they were not acting under color of state law, then the federal claims raised against them fail.  The Court therefore addresses this argument first.

To state a claim under Section 1983, a plaintiff must allege two essential elements: (1) that a right secured by the Constitution or laws of the United States was violated and (2) that the alleged violation was committed by a person acting under the color of state law.  *West v. Atkins*, 487 U.S. 42, 48 (1988); *Ketchum v. Alameda Cnty.*, 811 F.2d 1243, 1245 (9th Cir. 1987).

A private individual generally does not act under color of state law.  *See Gomez v. Toledo*, 446 U.S. 635, 640 (1980).  Nor does a private entity.  *See, e.g., Heineke v. Santa Clara Univ.*, 965 F.3d 1009, 1013 (9th Cir. 2020).  But a private party's conduct may be attributed to the state in certain circumstances.  Various tests may be used to determine whether a private entity or individual is acting under color of state law, including the public function test, the state compulsion test, the governmental nexus test, and the joint action test.  *Ochoa v. Public Consulting Group*, 48 F.4th 1102, 1109 (9th Cir. 2022).

Here, plaintiffs rely on the governmental nexus test and the joint action test.  *See* Dkt. No. 120 ("Opp'n to VMRC Mot.") at 8-9.  The Ninth Circuit has explained,

> The close nexus and joint action tests may be satisfied where the court finds a sufficiently close nexus between the state and the private actor so that the action of the latter may be fairly treated as that of the State itself, or where the State has so far insinuated [itself] into a position

of interdependence with the [private party] that it was a joint participant in the enterprise.

*Rawson v. Recovery Innovations*, 975 F.3d 742, 748 (9th Cir. 2020) (citations and internal quotation marks omitted).   Satisfaction of any one test is sufficient to find state action so long as no countervailing factor exists, and the underlying inquiry "is always whether the defendant has exercised power possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law." *Id.* (quoting *West*, 487 U.S. at 49) (internal quotation marks omitted).

Based on the allegations in the FAC, the Court finds that VMRC defendants were state actors, under at least the joint action test.  State action may be found where private individuals are willful participants in joint activity with the State or its agents that effects a constitutional deprivation. *See Johnson v. Knowles*, 113 F.3d 1114, 1119 (9th Cir. 1997) (citation omitted).  The "maxim" for joint action is that "if the state knowingly accepts the benefits derived from unconstitutional behavior then the conduct can be treated as state action."  *Tsao v. Desert Palace, Inc.*, 698 F.3d 1128, 1140 (9th Cir. 2012) (internal quotations and citations omitted).

In *West v. Atkins*, the Supreme Court held that a private doctor who contracted part-time to provide medical services to State inmates was acting under color of state law.  The Court explained that "custodial and supervisory functions are irrelevant to an assessment whether the particular action challenged was performed under color of state law." 487 U.S. at 53.  What was relevant was that "[t]he State bore an affirmative obligation to provide adequate medical care to West; the State delegated that function to respondent Atkins; and respondent voluntarily assumed that obligation by contract." *Id.* at 56.  Since that ruling, the Ninth Circuit has found joint action/close nexus where: a plaintiff alleged that a private hospital and ambulance service were under contract with the State to provide medical services to the indigent; and a private doctor and the county were involved in a complex and deeply intertwined process of evaluating and detaining mentally ill individuals.  *See Jensen v. Lane County*, 222 F.3d 570, 575-76 (9th Cir. 2000); *Lopez v. Dep't of Health Servs.*, 939 F.2d 881, 883 (9th Cir. 1991) (per curiam); *see also Roe v. Cal. Dep't of Developmental Servs.*, No. 16-CV-03745-WHO, 2017 WL 2311303, at *14 (N.D. Cal. May 26, 2017) (finding a regional center potentially liable as a state actor under the governmental nexus test).

VMRC defendants' motion spends much time attacking the sufficiency of the allegations regarding the contract that existed between VMRC and the County, and not enough time focusing on the actions VMRC and County defendants are alleged to have taken together. As the Supreme Court has explained, the precise terms of the private defendant's employment or contract are not the dispositive inquiry: "the dispositive issue concerns the *relationship* among the State," the private defendant, and the plaintiff. *See West*, 487 U.S. at 56.

Here, the FAC alleges that, while the County was responsible for Edison's day-to-day care, it was VMRC who worked with the County to plan Edison's medical care, who ultimately urged the County to move Edison out of Dillingham's home, who found and recommended Angel's Haven 2 as a placement for Edison, and who conducted the initial Angel's Haven 2 site visit in the stead of the County. The FAC states that County defendants and VMRC defendants were in close contact about the plan for Edison, how he was doing, whether he had the medical equipment he needed, and where he would live.

Specifically, the FAC alleges that Valley Mountain Regional Center, Inc. "is a California corporation, in the business of assisting consumers with developmental disabilities and their families in assessing, managing, overseeing and obtaining services and support from community and government agencies" serving various California counties. FAC ¶ 31. VMRC was under contract with Contra Costa County in the provision of services for the benefit of Edison. *Id.* VMRC first became involved in Edison's case in June 2015, when VMRC conducted an assessment of his needs—the first time Edison's medical needs were assessed since he entered foster care in September 2014. *Id.* ¶¶ 88, 91-93. Around this time, Danielle Wells (of VMRC), Georgette Shipe (one of the County social workers), and Jennifer Dillingham (who ran the home where Edison lived) "agreed together that Dillingham would 'manage and direct all of [Edison's] medical and dental requirements[,]'" without parental consent or court order. *Id.* ¶ 95.

The FAC further alleges that in April 2019 VMRC defendant Julie De Diego wrote an email to one of Edison's County social workers (Christy Roland) complaining about Edison's situation and about VMRC's "concern[s]" about his care and safety in the Dillingham home. *Id.* ¶ 121. That same day De Diego and Tracy Vaughn, both of VMRC, recommended Edison be placed at Angel's

United States District Court
Northern District of California

Haven 2.  *Id.* ¶ 125.  Two weeks later, Edison's County social workers obtained a court order authorizing them to move Edison to Angel's Haven 2, "at VMRC's recommendation."  *Id.* ¶ 126. "To obtain the order [the County] represented to the Court that 'Valley Mountain Regional Center has located an alternative placement for Edison through Angels Haven 2, this placement is a small family home that is staff operated and will provide Edison with adequate supervision that will commensurate [*sic*] with his level of need.'"  *Id.*  The County social workers "were relying completely and totally on VMRC's referral and recommendation[,]" having not themselves assessed the proposed placement to ensure it could meet Edison's needs.  *Id.* at ¶¶ 126 n.3, 128.  On April 29, 2019, De Diego (VMRC), Vaughn (VMRC), Roland (County), and Crespo (County) conferred and agreed that Angel's Haven 2 could meet Edison's needs, even though none of them had actually visited Angel's Haven 2.  *Id.* ¶¶ 128-129.  VMRC defendant Vaughn finally conducted the home inspection of Angel's Haven 2 several weeks after Edison was placed there.  *Id.* ¶¶ 130, 132.

These allegations suffice to show that VMRC was acting under color of state law with regard to Edison's case.  The FAC alleges that VMRC and the County social workers were closely communicating and working together regarding Edison's medical plan and his placement.  The FAC also alleges that "the County delegated to VMRC its responsibilities to vet recommended service providers including prospective placements . . . and VMRC willfully accepted such delegation of traditional governmental duties and obligations such that the County relied exclusively on VMRC for its placement recommendations and supervision of Edison[.]"  *Id.* ¶ 248.  As in *West* and *Jensen*, where private doctors were found to be state actors, here the FAC has alleged a strongly intertwined relationship between VMRC and the County with respect to Edison's case, as well as a delegation of responsibility of traditional County functions (particularly the assessment of a foster care placement) to VMRC, such that VMRC's actions "may be fairly treated as that of the State itself[.]" *See Rawson*, 975 F.3d at 748.

VMRC defendants attempt to distinguish the cases on which plaintiffs rely by arguing that the private entities in those cases were acting as *actual providers* of services, while VMRC argues it is well recognized that regional centers coordinate and contract for services but do not provide the services themselves.  VMRC defendants define "services" too narrowly.  Plaintiffs' core theory is

not that VMRC was providing Edison's services but that VMRC contracted with the County to perform the essential function of locating and screening Edison's potential placement to ensure it was appropriate.  According to the FAC, VMRC's failure in this regard led to Edison's placement at Angel's Haven 2, where he died of neglect roughly seven months later.

Based on the facts of the FAC, the case on which VMRC most heavily relies is distinguishable.  *See* VMRC Mot. at 9-12 (citing *McHone v. Far N. Regional Ctr.*, No. 14-cv-03385-EDL, 2015 WL 80676 (N.D. Cal. Jan. 5, 2015)).  In *McHone*, the district court dismissed a Section 1983 action brought against a regional center by the parents of a developmentally disabled adult who died soon after he moved to a residential facility (Baker House) pursuant to an admission agreement between the facility and the regional center.  Unlike in the present case, in *McHone* "there [were] no allegations that the state had any involvement in [the decedent's] admission to Baker House or any of the other alleged acts that occurred here." *Id.* at *9.  That is a far cry from this case, where the FAC alleges that the regional center worked in close collaboration with the County, and with the County relying on the regional center's representations, to obtain the change of placement.  The Court also notes that *McHone* did not analyze whether the regional center might be a state actor under the joint action test because the plaintiffs did not raise that argument.  *See id.* at *5.  Where, as here, the Court is presented with allegations of close collaboration between the State (i.e., the County) and the regional center, and of a delegation of the County's traditional duties to the latter, a different result is compelled.[11]

Finally, VMRC defendants argue that even if the VMRC entity is found to be a state actor, there has not been a showing that the individual VMRC defendants acted under color of state law.  The Court disagrees, based on the specific allegations, repeated above, regarding the actions that the individual defendants (Wells, Vaughn, and De Diego) took with respect to Edison's case.  Again,

---

[11] Nor is the Court persuaded by VMRC defendants' citation to the California Supreme Court decision in *Mohorishi v. Pacific Home*, 34 Cal. 4th 482 (2004).  That case did not raise claims under Section 1983 and therefore the *Mohorishi* court had no occasion to reach the question of whether the defendant regional center was a state actor.  While the case provides general background on the history and structure of regional centers in California, it is not instructive on the question of whether VMRC defendants were state actors under the facts alleged here.  The state action "analysis is necessarily 'determined based on the circumstances of each case.'" *Roe*, 2017 WL 2311303, at *14 (citing *Sutton v. Providence St. Joseph Med. Ctr.*, 192 F.3d 826, 836 (9th Cir. 1999)).

United States District Court
Northern District of California

United States District Court
Northern District of California

this case is readily distinguishable from the cases to which VMRC defendants cite, such as *Polk County v. Dodson*, in which the Supreme Court found that a public defender does not act under color of state law when performing a lawyer's traditional functions as defense counsel in criminal proceedings.  *See* 454 U.S. 312 (1981).  As the Supreme Court subsequently explained in *West v. Atkins*, the *Dodson* decision turned on the fact that the public defender role necessarily required the attorney "to act in a role independent of and in opposition to the State."  *West*, 487 U.S. at 50 (citing *Dodson*, 454 U.S. at 318-19, 320).  By contrast, in *West* (where state action <u>was</u> found), the contracted prison doctor's "professional and ethical obligations to make independent medical judgments did not set him in conflict with the State and other prison authorities.  Indeed, his relationship with other prison authorities was cooperative."  *Id.* at 51.  So too here were the individual VMRC defendants working in cooperation with the County; nothing in the FAC indicates that their professional obligations inherently set them up in opposition to the State.

Accordingly, the Court DENIES VMRC defendants' motion to dismiss, to the extent the motion is based on VMRC defendants' position that they were not acting under color of state law.

### B.    Constitutional Violation

In addition to arguing that they were not acting under color of state law, VMRC defendants argue that the federal claims additionally fail because plaintiffs have not sufficiently alleged VMRC defendants deprived Edison of a constitutional right.  The Court reserves reaching this argument in light of its ruling, *see* § I.A.2, *supra*, that plaintiffs must more clearly articulate the constitutional violations of the Second Claim.[12]

---

[12] Nor does the Court reach VMRC defendants' argument, raised for the first time in the reply brief, that, "[a]pparently due to an oversight, . . . it was not specifically argued in the moving papers that VMRC defendant Wells is also entitled to dismissal from the First Claim for Relief.  *See* VMRC Reply at 14.  The Court does not reach arguments raised for the first time in reply, though plaintiffs are given leave to amend the factual allegations as to Wells, should they wish to do so. VMRC defendants may raise this argument (in their <u>moving</u> papers) in the next round of briefing, should there be a next round.

### C. *Monell* Claim

VMRC defendants also move to dismiss Count 3 of the Third Claim, which alleges *Monell* liability against VMRC as an entity.  The Court applies the legal standard for *Monell* claims articulated in § I.B above.

In Count 3, the FAC alleges that VMRC should be held liable for the following:

> a. the custom and/or practice of failing to locate even minimally adequate supervision and/or care, including health care to children in county custody who have severe healthcare needs such as those of Edison here;
>
> b. the custom and/or practice of not providing sufficient services to a child that is in need of substantial 24/7 supervision and one-on-one care;
>
> c. by acting with deliberate indifference in implementing a practice of inadequate training and/or supervision and/or by failing to train and/or supervise its officers, agents and employees, in providing the constitutional protections guaranteed to individuals, including those under the Fourteenth Amendment, when performing actions related to the management of care and supervision of foster children, and the provision of reasonably-adequate supervision care to special needs children, including but not limited to health care. This list is not exhaustive . . .

FAC ¶ 251.

The Court agrees with VMRC defendants that this claim must be dismissed, primarily because the FAC does not allege sufficient incidents to constitute a custom or practice and because the allegations of Count 3 of the *Monell* claim are vague.  Unlike some of the *Monell* allegations against the County regarding exclusion of Edison's parents from his medical decisions—which occurred repeatedly and with multiple social workers over an extended period of time—the allegations against VMRC mainly center around one specific instance: VMRC's failure to assess Angel's Haven 2 as an appropriate placement for Edison, in the spring of 2019.  As explained elsewhere in this order, proof of random acts or isolated incidents of unconstitutional action by a non-policymaking employee is insufficient to establish the existence of a municipal policy or custom.  *See, e.g., Rivera*, 745 F.3d at 398.  The FAC further provides no more than conclusory allegations regarding VMRC's failure to train or failure to discipline its staff.

Accordingly, the Court GRANTS the motion to dismiss Count 3 of the Third Claim, with

leave to amend.

### D.    State Law Claims

VMRC defendants do not move to dismiss the state law claims on independent grounds. Rather, they argue that if the federal claims are dismissed from the case the Court should decline to exercise supplemental jurisdiction over the remaining state law claims.  Because the Court is granting plaintiffs leave to amend several of the federal claims, the Court will not dismiss the state law claims at this time.

## III.    Amendment of the Complaint

Although this case has been pending for nearly three years, today's order is the first time the Court has had occasion to issue a substantive ruling in the case.  Because plaintiffs have not yet amended the complaint with direction from the Court, and because it is conceivable that amendment could cure some of the deficiencies identified in this order, the Court will grant leave to amend.

The Court cautions, however, that simply adding length to the complaint will not necessarily strengthen plaintiffs' case, and in some instances may undermine it.  The Court generally agrees with County defendants' position that—given the stay that has been in place for several years while plaintiffs gathered state court records—"at this point Plaintiffs should be able to offer dates and specific violations rather than broad conclusions . . . ."  *See* Cnty. Mot. at 22.  Plaintiffs may be well served to begin to focus their attention, particularly in the Fifth Claim, on those instances that are supported by the evidence plaintiffs have gathered.  Leave is granted to amend the claims of the FAC as instructed in this order.

This is not, however, the time to be adding new claims to the case without express leave of the Court.  The Court notes that, in a footnote in one of their briefs, plaintiffs request to amend the complaint to add a new *Monell* claim against VMRC based on a practice/custom of excluding parents from medical decision making.  *See* Opp'n to VMRC Mot. at 22 n.10.  That request is DENIED.  Plaintiffs may file a formally noticed motion to amend, though the Court has reservations as to whether plaintiffs can show "good cause" under Federal Rule of Civil Procedure 16, when the

United States District Court
Northern District of California

Court already set a deadline to file the FAC and it does not appear this claim was left out for any reason other than oversight. This case has been pending for nearly three years. At some point, it is necessary to finalize the pleadings so this case may proceed.

## CONCLUSION

For the foregoing reasons and for good cause shown, the Court hereby GRANTS IN PART and DENIES IN PART the motions to dismiss, as follows:

- <u>First Claim</u> (Unwarranted Medical Examinations/Procedures; Exclusion of Parents): **DENIED**.

- <u>Second Claim</u> (Failure to Provide Dependent Minor Continued Safety, Security, Adequate Care and Supervision): **GRANTED**, except that the motion is **DENIED** as to VMRC defendants' argument that they are not state actors under 42 U.S.C. § 1983.

- <u>Third Claim</u> (*Monell*-Related Claims):

  - <u>Count 1</u>: **DENIED**, to the extent based on the allegations at FAC ¶¶ 225(a)-(d) and 226(a)-(d). **GRANTED**, to the extent based on the allegations at FAC ¶¶ 225(e) and 226(e).

  - <u>Count 2</u>: **GRANTED**.

  - <u>Count 3</u>: **GRANTED**, except that the motion is **DENIED** as to VMRC defendants' argument that they are not state actors under 42 U.S.C. § 1983.

- <u>Fourth Claim</u> (Violation of Federal Statutory Mandates): **GRANTED**.

- <u>Fifth Claim</u> (Breach of Mandatory Duties): **GRANTED**.

- <u>Sixth Claim</u> (Negligence/Breach of Duties Imposed Under Special Relationship): **DENIED**.

- <u>Seventh Claim</u> (Wrongful Death – CCP § 377.60): **DENIED**.

The dismissed claims are all dismissed with leave to amend.

Plaintiffs shall file the Second Amended Complaint **no later than January 19, 2024.**

**IT IS SO ORDERED**.

Dated: December 21, 2023

SUSAN ILLSTON
United States District Judge

United States District Court
Northern District of California