1

2

3

4                    UNITED STATES DISTRICT COURT

5                   NORTHERN DISTRICT OF CALIFORNIA

6

7     EDISON GATLIN, et al.,                    Case No. 21-cv-00370-SI

8                    Plaintiffs,

9          v.                                   ORDER GRANTING IN PART AND
                                                DENYING IN PART MOTIONS TO
10    CONTRA COSTA COUNTY, et al.,               DISMISS SECOND AMENDED
                                                COMPLAINT
11                   Defendants.
                                                Re: Dkt. Nos. 131, 132

12

13          Now before the Court are two motions to dismiss plaintiffs' Second Amended Complaint.

14   Dkt. Nos. 131, 132.  Pursuant to Civil Local Rule 7-1(b), the Court found this matter appropriate

15   for resolution without oral argument and vacated the hearing.  The Court now GRANTS IN PART

16   AND DENIES IN PART the motions to dismiss.

17

18                                    **BACKGROUND**

19          The factual and procedural background of this case are described more fully in the Court's

20   prior order granting in part and denying in part the motions to dismiss the First Amended Complaint.

21   Dkt. No. 129 ("Prior Order").  This order does not recount the allegations in full except as necessary

22   to resolve the pending motions.

23          To summarize, this case is brought by Edison Gatlin, a deceased minor, by and through his

24   successors in interest, parents Clarissa Simms and Edward Gatlin.  Edison Gatlin was born on

25   August 17, 2005, severely disabled with cerebral palsy, hydrocephalus, chronic lung disease, and

26   epilepsy.  Dkt. No. 130 ("SAC") ¶ 62.  On September 19, 2014, he was taken into the custody of

27   Contra Costa County.  He remained in foster care for the next five years, moving through several

28   different placements, all of which the SAC alleges were inadequate and could not equipped to care

for Edison's serious medical needs.  In December 2019, while residing at the Angel's Haven 2 group home, Edison died of septicemia, "which was totally treatable with common antibiotics."  *Id.* ¶¶ 178, 180.

On January 14, 2021, plaintiffs filed this suit in federal court.  Dkt. No. 1.  The case was stayed for several years while plaintiffs obtained Edison's case file records from the state juvenile dependency court.  On June 28, 2023, plaintiffs filed the First Amended Complaint.  Dkt. No. 95 ("FAC").  County defendants and Valley Mountain Regional Center defendants moved to dismiss.[1] Dkt. Nos. 110, 115.  Following a hearing, on December 21, 2023, the Court issued an order granting in part and denying in part the motions, with leave to amend.  Dkt. No. 129.  The Court ordered the stay lifted as of December 31, 2023.  Dkt. No. 126.

On January 12, 2024, plaintiffs filed the Second Amended Complaint.  Dkt. No. 130.  As before, plaintiffs bring seven claims for relief: (1) 42 U.S.C. § 1983 (Unwarranted medical examinations/procedures; exclusion of parents); (2) 42 U.S.C. § 1983 (Failure to provide dependent minor continued safety and security and even minimally-adequate care and supervision); (3) *Monell*-Related Claims; (4) 42 U.S.C. § 1983 (Violation of Federal Statute); (5) Breach of Mandatory Duties; (6) Negligence/Breach of Duties Imposed Under Special Relationship; and (7) Wrongful Death, Cal. Code Civ. Proc. § 377.60.  County defendants and VMRC defendants again move to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6).  Dkt. Nos. 131, 132.

## LEGAL STANDARD

Under Federal Rule of Civil Procedure 12(b)(6), a district court must dismiss a complaint if it fails to state a claim upon which relief can be granted.  To survive a Rule 12(b)(6) motion to dismiss, the plaintiff must allege "enough facts to state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  This "facial plausibility" standard requires

---

[1] "County defendants" are: Contra Costa County ("the County"); Craig Thurmond; Barbara Crespo; Christy Roland; Alexandria Kotran; Eleanor Walker; Kimberly Baker; Leslie Davis; Marcy Williamson; Kerissa Lynch; and Georgette Shipe.
"VMRC defendants" are: Valley Mountain Regional Center, Inc. ("VMRC"); Danielle Wells; Tracy Vaughn; and Julie De Diego.

the plaintiff to allege facts that add up to "more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Although courts do not require "heightened fact pleading of specifics," *Twombly*, 550 U.S. at 544, a plaintiff must provide "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* at 555. The plaintiff must allege facts sufficient to "raise a right to relief above the speculative level." *Id.*

In deciding whether the plaintiff has stated a claim, the Court must assume that the plaintiff's allegations are true and must draw all reasonable inferences in his or her favor. *Usher v. City of Los Angeles*, 828 F.2d 556, 561 (9th Cir. 1987). However, the Court is not required to accept as true "allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *St. Clare v. Gilead Scis., Inc.*, 536 F.3d 1049, 1055 (9th Cir. 2008). "[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678.

## DISCUSSION

### I.    Unwarranted Medical Examinations/Procedures; Exclusion of Parents (First Claim)

*By plaintiffs, as successors in interest of Edison Gatlin, against Defendants Baker, Williamson, Thurmond, Shipe, Davis, Dillingham, and Wells*

#### A.    Prior Order

With the First Claim, plaintiffs allege that defendants violated Edison's constitutional right "to remain free of non-consensual intrusive medical examinations/assessments and/or procedures [sic]" when they subjected Edison to such medical treatment "without just cause, parental consent, or a court order/warrant authorizing them." SAC ¶ 183. Previously, the Court denied County defendants' bid for qualified immunity on the First Claim, finding plaintiffs had adequately alleged the violation of a constitutional right. Prior Order at 10-12. VMRC defendants mistakenly did not move to dismiss the First Claim against Wells, the only VMRC defendant named in the First Claim. *See id.* at 32 n.12. The Court gave plaintiffs leave to amend the allegations as to Wells and gave VMRC defendants leave to move on this issue in the next round of briefing. *Id.*

United States District Court
Northern District of California

1    Accordingly, the First Claim will remain in the case against individually named defendants

2    Baker, Williamson, Thurmond, Shipe, Davis, Dillingham.  The question at this juncture is whether

3    the claim will remain in the case as to Wells.

4

5    **B.    VMRC's Motion**

6    The First Claim asserts a violation of Edison's constitutional rights when his parents were

7    excluded from participation in his non-emergency medical care without a court order authorizing

8    their exclusion.  Wells now moves to dismiss the First Claim against her, arguing the SAC does not

9    plead facts showing Wells herself subjected Edison to unwarranted medical evaluations/procedures

10   and/or excluded his parents.  For purposes of this motion, Wells does not dispute that a "child has

11   the right to the love, comfort, and reassurance of his parents when undergoing certain medical

12   procedures, including examinations, particularly those that may be invasive or upsetting."  Dkt. No.

13   131-1 at 9 (citing *Wallis v. Spencer*, 202 F.3d 1126, 1142 (9th Cir. 2000)).

14   The Court agrees with Wells that the SAC as framed does not plausibly allege that she

15   violated Edison's constitutional right to have his parents present for certain medical procedures.

16   The SAC contains detailed allegations, which the Court already found sufficient in the last round of

17   briefing, regarding the numerous instances where County defendants prevented Edison's parents

18   from providing him comfort and reassurance during his medical treatment and surgeries.  *See* Prior

19   Order at 10-12.  The allegations against defendant Wells are far more sparse.  Neither Wells nor

20   VMRC are identified in the complaint until June 2015, nine months after he was taken into custody.

21   *See* SAC ¶ 99.  Unlike certain County defendants, Wells is not alleged to have authorized or directed

22   any particular instances of medical treatment without Edison's parents' involvement.  In this way,

23   the allegations differ from the *Ingram* case on which plaintiffs rely.  *See* Dkt. No. 138 at 12 (citing

24   *Ingram v. Mouser*, No. 19-cv-00308-DCN, 2024 WL 249364, at *7 (D. Idaho Jan. 23, 2024)).  In

25   that case, the district court denied qualified immunity to the detective who "ordered" the children's

26   medical exams, in that the detective was the one who took the children into custody, called to

27   schedule their medical appointments, and directed the social worker to take the children to the

28   appointments.

United States District Court
Northern District of California

4

United States District Court
Northern District of California

Plaintiffs hang their hat on the allegation that Wells unlawfully reassigned medical decisionmaking authority to Dillingham, Edison's then-foster care provider, during Edison's Regional Center assessment on June 29, 2015. *See* SAC ¶¶ 110-111. But the more detailed factual allegations of the complaint do not show that Dillingham then improperly authorized medical treatment without consent or notice to Edison's parents. *See id.* ¶ 198 (alleging County defendants Shipe and Davis authorized and directed Edison's non-emergency medical care without parental consent on eight occasions from May 1 through December 7, 2015); *see also id.* ¶ 114 (alleging that from June 29, 2015, until February 2016, County defendants Shipe and Davis—but not Dillingham—habitually and continuously excluded Edison's parents from medical treatment). "Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679. Read in context, the allegations show that the practice of excluding Edison's parents from participation in his medical care both pre- and post-dated the June 2015 meeting that Wells led. *See, e.g.*, SAC ¶ 198. In other words, the SAC plausibly alleges that individual County defendants were engaged in this practice long before Wells became involved and that they continued this practice even after Wells allegedly assigned medical decisionmaking authority to Dillingham. Coupled with the lack of allegations plausibly tying Wells to any specific instances of excluding Edison's parents from his medical care, the Court finds the well-pleaded facts do not allow the inference of "more than the mere possibility of misconduct[.]" *See Iqbal*, 556 U.S. at 679.[2]

Accordingly, the Court **GRANTS** the motion to dismiss the First Claim as to Wells.

---

[2] The Court also notes that plaintiffs' brief exaggerates what is alleged as to Wells in the SAC. Plaintiffs' opposition brief asserts that, "[o]n a consistent basis from June 29, 2015, through and including at least December 7, 2015, Defendants Shipe, Davis, Dilingham [sic], **and Wells** authorized and/or directed that Edison undergo a series of intrusive and potentially traumatic medical examinations and/or evaluations" without a court order. *See* Dkt. No. 138 at 4 (emphasis added). However, Wells's name is absent from this allegation in the SAC itself. *See* SAC ¶ 197 ("From June 29, 2015, forward until February 2016, Defendants Shipe, Davis, Dillingham, and DOES 1-10, without court intervention or approval habitually and on a continuous and consistent basis excluded Edison's parents from all medical appointments . . . .").

## II.      Substantive Due Process (Second Claim)

*By plaintiffs, as successors in interest of Edison Gatlin, against all individual defendants*

### A.      Prior Order and Amendment

Plaintiffs' Second Claim alleges a violation of Edison's Substantive Due Process rights. Previously, the Court rejected County defendants' argument that qualified immunity applies, finding the FAC contained sufficient allegations of "deliberate indifference."   Prior Order at 12-13. Nevertheless, the Court dismissed the Second Claim with instruction that plaintiffs clarify whether they are suing under the "special relationship exception" of the Fourteenth Amendment or under the "state-created danger exception," as the FAC conflated these two doctrines.  *Id.* at 13-14.  The Court further advised that in amending,

> The claim shall clearly identify which defendants are alleged to have committed the violation(s) and shall state the facts in support.  The Court cautions plaintiffs that "in any future proceedings in the district court, each defendant's liability [will] be analyzed individually using the proper standard, whether that individual is a line-level caseworker, a supervisory official, or a municipality."  [Citation] (remanding with instructions that plaintiffs be allowed to amend their substantive due process claims, where the complaint did not adequately tie some of the factual allegations to particular defendants).

*Id.* at 14.

The Court also rejected VMRC defendants' argument that they were not acting under color of state law.  *Id.* at 26-32.  The Court reserved ruling on the argument that plaintiffs did not sufficiently allege VMRC defendants deprived Edison of a constitutional right, in light of its ruling that plaintiffs must more clearly articulate which constitutional violations form the basis of the Second Claim.  *Id.* at 32.

In the SAC, plaintiffs now clarify that they are bringing three counts under the Second Claim. Count 1 is for violation of the "special relationship doctrine" and is brought against defendants Baker, Williamson, Thurmond, Davis, Shipe, Lynch, Roland, Crespo, Kotran, and Walker (i.e., all the individual County defendants).  SAC at 49.  Plaintiffs include a chart connecting the factual allegations to each of these defendants.  *Id.* ¶ 119.  Count 2 is for "state created danger" and is also brought against each of the individual County defendants.  *Id.* at 56.  Count 3 is brought against defendants Dillingham, Gabriel Tauro, Maria Cecilia Tauro, John Mark Rafael Romero, Marisse

Casuco, Wells, Vaughn, and De Diego.[3]  *Id.* at 58.

County defendants move to dismiss Count 1 and Count 2.   VMRC defendants move to dismiss Wells, Vaughn, and De Diego from Count 3.

### B.   Count 1 (Special Relationship, as to Individual County Defendants)

As to Count 1, County defendants argue the SAC fails to allege that any individual defendant was deliberately indifferent to Edison's risk of harm.  According to County defendants, they are therefore entitled to qualified immunity because there was no constitutional violation of Edison's substantive due process rights.

In the Ninth Circuit,

> the proper standard for determining whether a foster child's due process rights have been violated is 'deliberate indifference'. . . . This standard requires an objective risk of harm and a subjective awareness of that harm. . . .  To be more specific, it requires (1) a showing of an objectively substantial risk of harm; and (2) a showing that the officials were subjectively aware of facts from which an inference could be drawn that a substantial risk of serious harm existed and (a) the official actually drew that inference or (b) that a reasonable official would have been compelled to draw that inference. . . .  [T]he subjective component may be inferred from the fact that the risk of harm is obvious.

*Henry A. v. Willden*, 678 F.3d 991, 1000-01 (9th Cir. 2012) (citing *Tamas v. Dep't of Social & Health Servs.*, 630 F.3d 833, 844-45 (9th Cir. 2010)) (internal quotation marks omitted).

In *Henry A.*, the Ninth Circuit reversed the district court's dismissal based on qualified immunity in a similar case involving children suing for harms they suffered in foster care.  The appellate court explained that a foster child has a "liberty interest in social worker supervision and protection from harm inflicted by a foster parent."  *Id.* at 1000 (quoting *Tamas*, 630 F.3d at 842).  This means that "a foster child's due process rights are violated when a state official exhibits deliberate indifference to a child's serious medical needs . . .; to suspected physical abuse in a foster home . . .; and to suspected sexual abuse in a foster home . . . ."  *Id.* at 1001 (citations omitted).

---

[3] The Tauros, Romero, and Casuco are defendants affiliated with Angel's Haven 2, the facility where Edison ultimately died.  *See* SAC ¶¶ 41-42, 51-52.  They take no part in the current motions, nor does defendant Dillingham.

United States District Court
Northern District of California

Looking at the factual allegations, the *Henry A.* court held:

> A reasonable official would have understood that failing to authorize Jonathan's medical treatment despite knowledge of his serious illness and repeated requests from his treating physician amounted to deliberate indifference to a serious medical need. A reasonable official would also have understood that failing to respond to Linda's reports of physical abuse in her foster home or the numerous reports of abuse in Mason's out-of-state placement would constitute deliberate indifference to the children's right to safety in their foster care placements.
>
> It may be that Plaintiffs cannot prove these allegations, or that they can only prove some of their less serious allegations, such as the failure to provide standardized periodic health screenings. If that turns out to be the case, the individual defendants can again raise the defense of qualified immunity at a later stage in the proceedings.

*Id.* at 1001. The Ninth Circuit went on to say that, in amending the complaint, the plaintiffs should tie their factual allegations to particular defendants. *Id.* at 1005 (citing *Tamas,* 630 F.3d at 847).

This Court will therefore analyze the allegations to see whether they support a claim against each of the individual County defendants named in Count 1. If the Court finds that the allegations suffice to state a claim against a particular defendant, the Court will not proceed to analyze the remaining factual allegations against him or her.

### 1.     Failure to Promptly Assess Medical Needs and Provide Case Plan

The SAC alleges that certain County defendants were deliberately indifferent to Edison's serious medical needs by failing to promptly assess his needs after he was taken into custody. Defendant Baker removed Edison and his siblings from their mother's care on September 19, 2014. SAC ¶ 67. No one conducted an assessment of Edison's medical needs until June 29, 2015. *Id.* ¶ 103. Moreover, no one from the County ever created a "case plan" as required under 42 U.S.C. § 675.[4] *Id.* ¶ 105 & n.1.

The SAC alleges that Baker was Edison's social worker when he was first taken into County

---

[4] As explained by the Ninth Circuit, "Section 675(1) [of the Child Welfare Act] provides a detailed definition of what a case plan must include, such as the child's health and educational records, a description of the child's permanency plan, and a plan for ensuring the child's educational stability." *Henry A.,* 678 F.3d at 1006.

United States District Court
Northern District of California

custody, that Williamson was Baker's supervisor, and that the two conferred about the plan for Edison and about his medical needs but that neither had him promptly assessed.  *Id.* ¶¶ 67-71.  Thurmond became Edison's case carrying social worker on October 3, 2014. *Id.* ¶ 80.  Shipe came on to assist Thurmond on Edison's case on March 23, 2015.  *Id.*  Davis was Thurmond and Shipe's direct supervisor during this period.  *Id.*  Although it was apparent by April 2015 that Edison was suffering from severe malnutrition, and although Thurmond, Davis, and Shipe authorized various non-emergency medical procedures including shunt revision surgery, they continued not to arrange for a full assessment of his medical needs.  *Id.* ¶¶ 83-85, 89.

Given Edison's severe disabilities of cerebral palsy, hydrocephalus, chronic lung disease, and epilepsy, the Court finds that a reasonable official would have understood that failing to assess his medical needs or provide a case plan during his first nine months in foster care constitutes deliberate indifference to Edison's right to adequate medical care.  *See Henry A.*, 678 F.3d at 1001.

Similarly, the SAC alleges that Lynch was the County social worker assigned to take over day-to-day management of Edison's care for a twenty-month period, from January 8, 2016, to September 26, 2017.  SAC ¶¶ 118, 121.   The SAC further alleges, *inter alia*, that "Lynch failed to contact Edison's physicians or other medical professionals to 'effectively and efficiently' identify and meet Edison's needs, to monitor his safety and obtain the particular physician's, or other medical professional's perception of Edison's well-being all in violation of Division 31 regulations."  *Id.* ¶ 119 (internal brackets omitted).  As noted, the SAC alleges that Edison *never* received a "case plan" as described in 42 U.S.C. § 675. *Id.* ¶ 105.  For a child with Edison's level of serious medical needs, the failure of his day-to-day social worker to create a case plan or contact his physicians and other medical professionals *during a twenty-month period* in foster care, if true, constitutes deliberate indifference.

The Court therefore finds the allegations in Count 1 adequately stated as to Baker, Williamson, Thurmond, Davis, Shipe, and Lynch.

### 2.     Failure to Respond to Signs of Abuse and Severe Neglect

As to the remaining individual County defendants named in Count 1—Roland, Crespo,

United States District Court
Northern District of California

Kotran, and Walker—the Court finds the SAC has more than adequately alleged their deliberate indifference to Edison's right to safety in his foster care placements. Defendant Roland was Edison's case worker and Crespo was Roland's supervisor during the period of time in which Edison incurred multiple unexplained injuries while living in the Dillingham home. Despite a plan calling for Edison's 24/7 care and supervision, in June 2018 Edison was "injured by unknown means in his room, alone, at night." *Id.* ¶ 125. This information was conveyed to Roland, who shared the information with Crespo; neither took any corrective action. *Id.* In August 2018, Roland "discovered evidence that would suggest Edison was still being left alone in his room unmonitored." *Id.* ¶ 127. Again, she reported this to Crespo. *Id.* In May 2018 and in August 2018, Dillingham admitted to Roland that she was struggling with, and unable to meet, Edison's medical care and supervision needs. *Id.* ¶¶ 123, 128. In December 2018, Roland and Crespo learned that another special needs foster child in the Dillingham home had died. *Id.* ¶ 130. This was the *second* special needs foster child to die in the home while Edison was living there. *Id.* ¶¶ 120, 130. Not only did Roland and Crespo take no steps to ensure Edison's continued safety or to move him, but they also failed to inform the dependency court about the death at a status review hearing for Edison that took place about one week later. *Id.* ¶ 133. Roland and Crespo were also aware that, rather than provide face-to-face supervision, "Dillingham had placed a video camera at the foot of Edison's bed and when he needed attention, Edison was left to 'knock on the wall.'" *Id.* ¶ 138.

With regard to Kotran and Walker, they were the social worker and supervisor, respectively, assigned to Edison in the months preceding and at the time of his death. At this point, Edison was living at Angel's Haven 2. Kotran took over the management of Edison's case from Roland on June 10, 2019. *Id.* ¶ 153. In the months leading up to his death, Edison's teacher complained multiple times to Kotran that she was concerned about Edison's care at Angel's Haven 2—he seemed too skinny, he had "lots of phlegm and salivate[s] and chokes frequently," his wheelchair was falling apart, and he didn't seem to be on his seizure medication. *Id.* ¶¶ 157 (Aug. 6, 2019 conversation), 161 (Aug. 29, 2019 conversation). During his first four and a half months at Angel's Haven 2, Edison lost 16% of his body weight. *See id.* ¶¶ 150, 167. Kotran herself observed Edison's malnutrition as early as mid-June 2019. *Id.* ¶ 154. On August 14, 2019, Walker submitted a formal

report to the court representing that Edison "seems to be doing well according to [his teacher] Ms. Thomas and the class aid." *Id.* ¶ 159. During an August 2019 visit to Angel's Haven 2, Kotran observed that Edison was "unattended, parked in front of the TV, in a broken wheelchair, with his head propped up by a neck pillow" and that he did not have a suction machine (which was a "massive red flag" given Edison's choking danger). *Id.* ¶ 160. At an appointment in late September 2019, Edison's doctor noted his "dangerously low" weight at a visit in late September 2019, and this information was communicated to Kotran two weeks later. *Id.* ¶ 167. The SAC alleges that around November 20, 2019, defendants Vaughn, De Diego, Kotran, and Walker all agreed that Edison should be moved and began to seek an alternative placement. *Id.* ¶ 173. Yet that same day, Kotran and Walker submitted a status review report to the court that again did not disclose anything about Edison's deteriorating health or about Angels Haven 2's inability to provide the care and supervision Edison needed. *Id.* ¶ 174. Just a few days before Edison's death, Edison's teacher sent Kotran an email informing her that Angel's Haven 2 had sent Edison to school with a viral infection and asking, "Any idea if he will be placed elsewhere anytime soon? I continue to believe it's not the best placement." *Id.* ¶¶ 176-177. Edison died of septicemia, "which was totally treatable with common antibiotics[,]" at some point between the evening of December 7 and morning of December 8, 2019. *Id.* ¶¶ 178-179. In other words, the SAC alleges that for more than five months after taking over Edison's case, and despite numerous communications from his doctor and teacher regarding Edison's malnutrition and neglect, Kotran and Walker left Edison at Angel's Haven 2 and submitted misleading status reports to the dependency court.

Given the detailed allegations of potential abuse and severe neglect as described above, the Court finds Count 1 is sufficiently stated against Roland, Crespo, Kotran, and Walker. *See Henry A.*, 678 F.3d at 1001 ("A reasonable official would also have understood that failing to respond to Linda's reports of physical abuse in her foster home or the numerous reports of abuse in Mason's out-of-state placement would constitute deliberate indifference to the children's right to safety in their foster care placements.").

The Court **DENIES** County defendants' motion to dismiss Count 1 of the Second Claim.

### C.      Count 2 (State-Created Danger, as to Individual County Defendants)

County defendants' motion to dismiss the state-created danger claim focuses on the decisions to place Edison in the Collins home, in the Dillingham home, and in Angel's Haven 2. County defendants argue the SAC fails to allege deliberate indifference to a known or obvious danger when Edison was placed in any of these three placements.  County defendants argue, for instance, that the SAC contains "no allegations that any of the homes where Edison was placed were unlicensed or had a history of confirmed abuse or neglect claims." Dkt. No. 132 at 17.

The SAC frames this count somewhat more broadly.  In addition to challenging County defendants' initial decision to place Edison to each of the three foster homes, plaintiffs also argue that County defendants created danger by *maintaining* Edison in those placements after receiving notice of potential abuse or neglect.

Under the Fourteenth Amendment's Due Process clause, state liability may attach "for failing to protect an individual from harm by third parties where the state action affirmatively places the plaintiff in a position of danger, that is, where state action creates or exposes an individual to a danger which he or she would not have otherwise faced." *Henry A.*, 678 F.3d at 1002 (citations, internal quotation marks, and brackets omitted).  In evaluating claims under the state-created danger exception, courts ask: "(1) whether any affirmative actions of the official placed the individual in danger he otherwise would not have faced; (2) whether the danger was known or obvious; and (3) whether the officer acted with deliberate indifference to that danger." *Id.* (citing *Kennedy v. City of Ridgefield*, 439 F.3d 1055, 1062-64 (9th Cir. 2006)).

Looking to the case law, a state official's decision to place a child in a particular foster home or to expose a child to certain individuals may fall under the state-created danger exception where the state *already* has knowledge of an existing risk of abuse in that home or by those individuals. *Id.* at 1003.  A complaint may state a claim, for instance, by alleging the state placed children "in a foster home that had a known history of neglect;" where it "required [a child] to have unsupervised visits with his grandparents despite having knowledge that they had abused him;" or where it "placed [a child] in an out-of-state facility that had a known history of chronic neglect and abuse." *Id.* at 1002; *see also D.C. by & through Cabelka v. Cnty. of San Diego*, 445 F. Supp. 3d 869, 891 (S.D.

United States District Court
Northern District of California

Cal. 2020) ("Based on the body of state-created danger caselaw, the Social Worker Defendants were on notice that placing and maintaining a foster child with a known history of sexually abusing his male foster siblings in a home with three young boys would violate the young boys' rights to due process.").

Here, the allegations regarding what the County knew or should have known before placing Edison in any of the three placements are both conclusory and sparse. Plaintiffs bring this claim against all individual County defendants but do not state what these defendants knew at the time of placement.[5]

With regard to Edison's placement in the Collins home in September 2014, the SAC does not allege that there was a "known or obvious danger" in the home when Edison was first placed there or that County defendants were deliberately indifferent to that danger. There are simply no allegations as to what any of the individual defendants knew with regard to the Collins home or what a reasonable official would have uncovered had they looked.

The allegations are only slightly more detailed with regard to the Dillingham home, where Edison was moved in May 2015. The SAC alleges that "Dillingham already had more on her hands than she could reasonably handle. She already had one other special needs foster child as well as four children of her own. It would have been apparent to any reasonable person in Shipe's and Davis's situation that Dillingham was already overloaded and was incapable of meeting Edison's substantial and complex needs." SAC ¶ 98. The SAC does not allege that the County had any prior reports of abuse or neglect on Dillingham, that Dillingham was not licensed to care for a child with Edison's medical needs, or that Dillingham was exceeding the capacity of her foster care license by taking Edison. The decision to place Edison with Dillingham predated the June 29, 2015 assessment where it was found that Edison required 24/7 care and supervision. *See id.* ¶ 110. Standing alone, the allegation that Dillingham already had one special needs foster child and four children of her own, without more, does not suffice to show the County acted with deliberate indifference to a

---

[5] It is further unclear whether the SAC challenges all three of Edison's placements. While Count 2 uses language regarding "each of the aforementioned placements," *see, e.g.*, SAC ¶ 231, plaintiff's opposition brief only mentions the Dillingham home and Angel's Haven 2. *See* Dkt. No. 137 at 15-16.

known or obvious danger by placing Edison in the home back in May 2015.

The same goes for Edison's placement at Angel's Haven 2. The SAC does not show that any individual at the County was deliberately indifferent to a known or obvious danger when they placed Edison there in May 2019. As with the Dillingham home, there are no allegations that Angel's Haven 2 was not licensed to take a child with Edison's level of needs, that the facility was exceeding its placement capacity, or that there were prior reports of abuse or neglect regarding the facility or any of its staff. To be clear, it is troubling that no one from the County or from VMRC personally inspected the home prior to Edison's placement. Plaintiffs argue that if someone had inspected the home it would have become obvious that Angel's Haven 2 could not meet Edison's needs, based on its staffing levels and the number of residents they already had. SAC ¶ 149. But what is absent from the complaint is any allegation that, at the time of Edison's placement there, Angel's Haven 2 was unlicensed, was violating the scope of its license, or employed staff with known histories of abuse or neglect. *Cf. Tamas*, 630 F.3d at 843-44 (finding county social workers' approval of a foster license despite referrals reporting the foster parent's physical and sexual abuse "created a danger of molestation that Monica would not have faced had the state adequately protected her as a result of the referrals").

The Court agrees with County defendants that the remainder of Count 2 is essentially just a reframing of the allegations of Count 1 (Special Relationship). This part of the claim alleges that defendants violated the state-created danger doctrine by "maintaining" Edison in a particular placement after suspected abuse or neglect surfaced. Once a child is already in a particular placement, the state's failure to respond to suspected abuse or neglect in that home is more properly pursued under the "special relationship exception" to the Fourteenth Amendment. *See Henry A.*, 678 F.3d at 998 (discussing with approval a complaint that listed "failure to adequately respond to reports of abuse" as a violation of the "special relationship doctrine"). The Court has already found the allegations of Count 1 sufficient against the individual County defendants.

In sum, the Court **GRANTS** the motion to dismiss Count 2 (State-Created Danger). As it is possible that plaintiffs could add further facts to cure the deficiencies, the Court will grant one final opportunity to amend Count 2 of the Second Claim. As previously ordered, the amended claim

14

must tie the facts to specific individual defendants.

### D.    Count 3 (VMRC Defendants)

Plaintiffs bring Count 3 against various non-County individual defendants, including VMRC defendants Wells, Vaughn, and De Diego.  Based on the substance of the allegations and the briefing, it is apparent plaintiffs bring this Count under both the special relationship and state-created danger doctrines.  Plaintiffs challenge the lack of response to indications of abuse and neglect while Edison was in the Dillingham home and Angel's Haven 2 and also challenge Vaughn and De Diego's role in placing Edison at Angel's Haven 2.  VMRC defendants move to dismiss, arguing the factual allegations do not show they acted with deliberate indifference.

#### 1.    Special Relationship Doctrine

The Court finds the allegations sufficiently stated as to Wells, for failing to respond to indications of abuse or neglect in the Dillingham home.  The SAC alleges that Wells was directly involved in Edison's management and care, meeting with him regularly and coordinating and participating in all of his care from October 28, 2015 through December 21, 2018. SAC ¶ 116.  The SAC further alleges, "In large part Wells fulfilled the required role of Edison's County assigned social workers."[6]  *Id.* ¶ 117.  In May 2018 and again in August 2018, Dillingham reported to Wells and Roland that she "continue[d] to struggle with, and was unable to meet, Edison's medical care and supervision needs."  *Id.* ¶¶ 123, 128.  Nevertheless, Edison remained in Dillingham's care until May 2019.  In the interim: in June 2018, Edison was "injured by unknown means in his room, alone, at night[;]" in November 2018, Edison had an "extremely uncharacteristic" ten-minute seizure at school; and in December 2018, another special needs foster child died in Dillingham's home of "possible neglect"—the second child to die there during Edison's tenure.  *Id.* ¶¶ 125, 129-130.

---

[6] In the prior order, the Court rejected VMRC defendants' argument that they were not state actors under Section 1983, citing in part the "allegations of close collaboration between the State (i.e., the County) and the regional center, and of a delegation of the County's traditional duties to the latter . . . ." Prior Order at 31.

Following these events, Wells failed to make any mandatory reports of suspected abuse or neglect, took no steps to ensure Edison's continued safety in the Dillingham home, and failed to suggest Edison be placed with a different caretaker. *Id.* ¶¶ 131-132. Whether or not plaintiffs will be able to prove these allegations is a matter for another day. For now, the Court finds the SAC sufficiently alleges that Wells, as the day-to-day coordinator of Edison's care during this period, acted with deliberate indifference to suspected abuse or neglect in the Dillingham home. The claim against Wells is sufficiently stated under the "special relationship" exception of the Substantive Due Process clause.

The Court will grant dismissal, however, of "special relationship" claims against Vaughn and De Diego. The SAC is less clear in connecting these defendants to alleged violations, outside of general allegations of the failure to file mandated child abuse reports. Vaughn "took over supervision and management of Edison's healthcare management and care needs" at some point after February 11, 2019. *Id.* ¶¶ 136-137. The SAC alleges that in mid-March 2019 it was reported to Vaughn that Edison was not receiving face-to-face or 24/7 supervision at Dillingham's home and that he had unexplained injuries on his face. *Id.* ¶¶ 138-139. The SAC goes on to state that Vaughn took "it upon herself to find resources for additional support for Dillingham" and that a few weeks later, De Diego, "apparently frustrated with [County] Defendant Roland's lack of response to Edison's obviously dangerous condition in the Dillingham home, . . . wrote an email to Roland and Crespo complaining about Defendant Roland's lack of 'follow up.'" *Id.* ¶ 140. That email, sent April 3, 2019, "stated in no uncertain terms that VMRC did not support Edison's placement with Defendant Dillingham . . . ." *Id.* That same day, Vaughn and De Diego recommended Edison be placed at Angel's Haven 2. *Id.* ¶ 142. In this way, the allegations show that Vaughn and De Diego took affirmative actions to address their concerns about the care Edison was receiving at Dillingham's home and to get the County to move him. The allegations do not show that Vaughn or De Diego acted with deliberate indifference to potential abuse or neglect in the Dillingham home.

The allegations are similarly sparse as to Vaughn and De Diego's knowledge of potential abuse or neglect once Edison was placed at Angel's Haven 2. The only specific discussion of Vaughn during this time period shows that Vaughn was working with Kotran to address concerns

16

1    about the services Edison was receiving and to problem-solve how to get him a suction machine.

2    *See id.* ¶¶ 163, 166.

3          Accordingly, to the extent the SAC alleges that Vaughn and De Diego violated the "special

4    relationship exception" to the Substantive Due Process clause of the Fourteenth Amendment, those

5    claims are dismissed.

6

7                        **2.       State-Created Danger Doctrine**

8          To the extent the SAC alleges that any of the individual VMRC defendants violated the state-

9    created danger doctrine of the Substantive Due Process clause, those claims are not stated with

10   plausibility, for the same reasons given above as to Edison's placement at Angel's Haven 2.  *See*

11   § II.C, *supra*.  As already explained, the SAC is sparse on facts regarding what known or obvious

12   danger Vaughn and De Diego were deliberately indifferent to when recommending Angel's Haven

13   2.[7]  The general allegations of low staffing numbers, without more, do not rise to the level of

14   plausibly alleging deliberate indifference.  The Court **GRANTS** VMRC defendants' motion to

15   dismiss the state-created danger claims as to Wells, Vaughn, and De Diego.

16

17   **III.    *Monell* Liability (Third Claim)**

18   *By plaintiffs, as successors in interest of Edison Gatlin, against Contra Costa County*[8]

19         Plaintiffs bring two Counts against the County pursuant to *Monell v. Department of Social*

20   *Services*, 436 U.S. 658 (1978).  Local governments are "persons" subject to liability under 42 U.S.C.

21   § 1983 where official policy or custom causes a constitutional tort, *see Monell*, 436 U.S. at 690;

22   however, a city or county may not be held vicariously liable for the unconstitutional acts of its

23

24         [7] Wells began working with Edison after he was already at the Dillingham home, and she
25   was no longer involved in Edison's case at the time of his placement at Angel's Haven 2.  Plaintiffs
     forward no specific argument regarding application of the state-created danger doctrine as to Wells,
26   and the Court finds no support for such a theory in the SAC.

27         [8] Although the caption of the Third Claim continues to list VMRC as a defendant, the factual
     allegations regarding VMRC have been removed.  *See* SAC at 61; *see also* Dkt. No. 131-1 at 1 n.1.
28   Plaintiffs clarify in their opposition brief that they have voluntarily dismissed their *Monell* claim
     against VMRC.  Dkt. No. 138 at 1 n.1.

United States District Court
Northern District of California

employees under the theory of *respondeat superior.  See Bd. of Cnty. Comm'rs. of Bryan Cnty. v. Brown*, 520 U.S. 397, 403 (1997); *Monell*, 436 U.S. at 691; *Fuller v. City of Oakland*, 47 F.3d 1522, 1534 (9th Cir. 1995).  To establish an official policy that would give rise to *Monell* liability, a plaintiff must allege facts to support one of the following to survive dismissal of his claim: (1) an unconstitutional custom or policy behind the violation of rights; (2) a deliberately indifferent omission, such as a failure to train or failure to have a needed policy; or (3) a final policy-maker's involvement in, or ratification of, the conduct underlying the violation of rights.  *Clouthier v. Cnty. of Contra Costa*, 591 F.3d 1232, 1249-50 (9th Cir. 2010) (synthesizing authorities), *overruled on other grounds by Castro v. Cnty. of Los Angeles*, 833 F.3d 1060 (9th Cir. 2016).

The Court previously found the Count 1 allegations sufficiently stated with regard to the County's policy or custom regarding the medical care of children in County custody.  Prior Order at 17-18.  The Court dismissed Count 2 of the *Monell* claim from the FAC, regarding the County's failure to protect children in custody, finding the allegations "insufficiently pled either because they are too vague and/or because the FAC does not allege more than one incident, and so there can be no claim of an unconstitutional county-wide practice or custom."  *Id.* at 18.

Plaintiffs have amended their *Monell* claim, and County defendants move to dismiss Count 2.  The amended Count 2 is for "Failure to provide Edison Gatlin, a dependent minor[,] with continued safety, security, adequate care or supervision[.]"  SAC at 65.  Count 2 challenges four different types of customs and/or practices, described in further detail below.  *See id.* ¶ 273.

County defendants argue that Count 2 contains no more than formulaic recitations of the elements, without underlying facts.  The Court agrees that plaintiffs have failed to cure some of the deficiencies previously identified.  *See* Prior Order at 18-19.  For instance, plaintiffs bring a *Monell* claim for the County's alleged "custom and/or practice of failing to assess the particular service needs of children promptly after being taken into custody[.]"  SAC ¶ 273(a).  The Court previously noted that the FAC "describes only the singular incident where Edison was initially taken into custody and did not receive an assessment; it does not provide any information about other children being taken into custody and whether the County also failed to assess their needs promptly.  This isolated allegation will not suffice to show a custom or practice."  Prior Order at 18.  The SAC adds

no further allegations.  Even assuming plaintiffs are correct that a single violation may form the basis of a *Monell* claim if multiple municipal actors are involved, *see* Dkt. No. 137 at 18-19, the Court finds that under the facts alleged here, the single instance of Edison not receiving a prompt assessment after being taken into custody does not warrant departure from the general rule that "[a] single constitutional deprivation ordinarily is insufficient to establish a longstanding practice or custom," even if two different social workers (here, Baker and Williamson) were involved.  *See Christie v. Iopa*, 176 F.3d 1231, 1235 (9th Cir. 1999) (citing *Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir. 1996)).

For the same reasons, the Court dismisses the claims raised in SAC ¶ 273(b), which challenge the alleged "custom and/or practice of placing foster children in community care facilities and/or foster homes without first assessing the particular placement[.]"  The SAC describes, in rather conclusory terms, three instances in which Edison was placed in a home without a prior assessment, and no instances of this happening to other children.  The SAC alleges only one instance, at Angel's Haven 2, where Edison was placed without the County conducting an in-person inspection.  Again, the Court finds these allegations do not rise to the level of plausibly showing the social workers were acting pursuant to County policy or custom.

With regard to the allegation in SAC ¶ 273(d) that the County has a "custom and/or practice of failing to provide even minimally- adequate care, including health care" to children in its custody, the Court dismisses this claim as vague and conclusory for the same reasons stated previously.  *See* Prior Order at 18-19.  Plaintiffs have added no allegations to bolster this claim.

However, the Court will deny the County's motion to dismiss the allegations as stated in SAC ¶ 273(c).  This count challenges "[t]he custom and/or practice of maintaining foster children in placement in community and/or foster care facilities known or suspected to be inadequate to the needs of particular [sic] child, including the needs of minors with severe disabilities and/or special needs."  Although it is a close call, the Court finds the allegations of the SAC plausibly support the allegation that the County's failure to respond to suspected or known inadequacies in a foster placement went beyond an isolated or random incident.  In Edison's case alone, the SAC alleges that: five social workers took no action when Edison's weight dropped from 75 pounds down to 50

19

pounds while he was in the Collins home, *see* SAC ¶ 92;[9] three social workers took no action on suspected abuse or neglect at the Dillingham home, including two different instances in which another special needs child died at the home while Edison was living there, *see id.* ¶¶ 120, 123-125, 127-132, 134-140; and two didn't investigate abuse and neglect concerns regarding Angel's Haven 2, *see id.* ¶¶ 153-160, 165, 167, 170-171, 174-175.  In other words, the allegations chronicle a series of numerous County social workers failing to take action on potential abuse or neglect in Edison's placements, over a period of roughly five years.  "It is difficult to discern from the caselaw the quantum of allegations needed to survive a motion to dismiss a pattern and practice claim." *Gonzalez v. Cnty. of Merced*, 289 F. Supp. 3d 1094, 1099 (E.D. Cal. 2017).  Here, at the pleading stage, the Court finds the SAC sufficiently alleges a *Monell* violation under Count 2, SAC ¶ 273(c).

## IV.    Federal Child Welfare Statutes (Fourth Claim)

*By plaintiffs, as successors in interest of Edison Gatlin, against all County defendants*

The Court previously dismissed the Fourth Claim, finding the claim as framed in the FAC was "so filled with statutory references that it is unclear precisely which statutes plaintiffs sue to enforce here."  Prior Order at 19.  Plaintiffs have cured this deficiency.  In the SAC and in their brief, plaintiffs clarify that this claim challenges only the case plan provisions of the federal Adoption Assistance and Child Welfare Act ("CWA"), codified at 42 U.S.C. §§ 671(a)(16) and 675(1). SAC at 68-70; Dkt. No. 137 at 21.  County defendants concede that the case plan provisions are privately enforceable.  Dkt. No. 132 at 20-21.  Defendants' motion to dismiss the Fourth Claim is therefore DENIED.

## V.    Breach of Mandatory Duties (Fifth Claim)

*By plaintiffs, as successors in interest of Edison Gatlin, against all County defendants[10]*

---

[9] The SAC alleges that Edison was ultimately removed from the Collins home due not to concerns about his safety but because Mrs. Collins was scheduled to undergo surgery.  SAC ¶ 93.

[10] Plaintiffs clarify that the inclusion of Edison's parents as individual plaintiffs in the header of the Fifth Claim was accidental and is withdrawn.  Dkt. No. 137 at 21.  The Court therefore does not reach County defendants' argument that some of the allegations in the Fifth Claim, brought by

California Government Code § 815.6 allows a plaintiff to sue a public entity for a particular type of injury where the public entity had a mandatory duty to protect against the risk of that injury. "A plaintiff seeking to hold a public entity liable under Government Code section 815.6 must specifically identify the statute or regulation alleged to create a mandatory duty." *In re Groundwater Cases*, 154 Cal. App. 4th 659, 689 (2007) (citation omitted). To establish whether liability may be imposed on a public entity, the following must be met: (1) the enactment in question must impose a mandatory, not discretionary, duty; (2) the enactment must be intended to protect against the kind of risk of injury suffered by the party asserting the statute as the basis of liability; and (3) the breach of duty must be a proximate cause of the plaintiff's injury. *Id.* (citing *Ibarra v. Cal. Coastal Comm'n*, 182 Cal. App. 3d 687, 692-93 (1986)). Whether an enactment creates a mandatory duty is a question of law. *Haggis v. City of Los Angeles*, 22 Cal. 4th 490, 499 (2000).

To interpret an enactment as imposing a mandatory duty on a public entity, "the mandatory nature of the duty must be phrased in explicit and forceful language." *Collins v. Thurmond*, 41 Cal. App. 5th 879, 914 (2019) (*quoting Quackenbush v. Superior Ct.*, 57 Cal. App. 4th 660, 663 (1997)). "It is not enough that some statute contains mandatory language. In order to recover plaintiffs have to show that there is some *specific* statutory mandate that was violated by the [public entity] … ." *In re Groundwater Cases*, 154 Cal. App. 4th at 689 (*quoting Wash. v. Cnty. of Contra Costa*, 38 Cal. App. 4th 890, 896-97 (1995)). "[T]he enactment at issue [must] be obligatory, rather than merely discretionary or permissive, in its directions to the public entity; it must require, rather than merely authorize or permit, that a particular action be taken or not taken." *Haggis*, 22 Cal. 4th at 498. Moreover, "the enactment allegedly creating the mandatory duty must impose a duty on the specific public entity sought to be held liable." *In re Groundwater Cases*, 154 Cal. App. 4th at 689.

The Court previously dismissed this claim, finding that the claim as stated in the FAC asserted a long list of violations against all County defendants, without distinguishing which violations were asserted against whom. Prior Order at 23-24. Plaintiffs have amended this claim, citing statutes and various California Department of Social Services ("DSS") regulations embodied

---

the parents individually, are time-barred.

in the Manual of Policies and Procedures ("MPP").[11]  County defendants now argue: that there are no allegations supporting a violation of California Penal Code section 11165.9, which, among other things, states that a county welfare department "shall accept a report of suspected child abuse or neglect[;]" that any allegation County defendants violated a mandatory reporting duty for not reporting further instances of suspected abuse of Edison is invalid because, according to the County, "the County cannot report to itself of [sic] the suspected abuse[;]" that County defendants are immune from any allegations that they failed to investigate, or botched the investigation of, reports of suspected abuse or neglect, under California Government Code sections 820.2 and 821.6; and that the mandatory duty claim is still vague.  Dkt. No. 132 at 22-26.

### A.   Vague or Unsupported Allegations

At the outset, the Court finds that some of the allegations in the SAC's Fifth Claim continue to suffer from vagueness and/or are unsupported by any facts in the SAC.  These are allegations:

- that various County defendants "did not properly . . . maintain a record of all reports received[,]" SAC ¶ 292.

- that Baker and Williamson failed to ensure Edison's medical needs were met during transitional care from 9/19/14 to 9/22/14, SAC ¶ 293;

- that various County defendants failed to consider Edison's biological father as a potential placement and failed to give preferential placement treatment to other adult relatives, SAC ¶¶ 302, 304;

- that various County defendants failed to consider ease of accessibility for visitation and appropriateness of the placement when placing Edison in out-of-county foster care, SAC ¶ 303;[12]

---

[11] The Court takes judicial notice of the DSS Child Welfare Services Manual, Online Manual of Policies and Procedures, https://www.cdss.ca.gov/inforesources/letters-regulations/legislation-and-regulations/child-welfare-services-regulations [https://perma.cc/VZ7N-9ZX4].

[12] The regulations on which this claim relies are regulations governing "Temporary Placement" of a child, rather than foster care placement.  See SAC ¶ 303 (citing MPP §§ 31–410.7-.76).  There are no allegations in the SAC regarding Edison's temporary placement.

United States District Court
Northern District of California

- that Roland and Crespo failed to confirm Angel's Haven 2's licensing and status both prior to Edison's placement there and after, SAC ¶ 305;

- and that County defendants "breached their mandatory duties, as set forth above, from September 19, 2014 through December 8, 2019, in that Defendants were required to meet certain pre-placement evaluation and approval duties, as well as, [sic] providing adequate services to allow Plaintiffs, Clarissa and Edward[,] to reunify with Edison and avoiding unfairly obstructing Plaintiffs['] ability to pursue those services and refrained from doing so[,]" SAC ¶ 306.

*See also* Prior Order at 21-22 (dismissing claims based on the alleged failure to consider adult relatives as possible foster placements, for lack of factual support, with leave to amend); § II.C, *supra* (noting a lack of allegations that Angel's Haven 2 was not licensed to take Edison).  The mandatory duty claims based on the above allegations are therefore dismissed.[13]

### B.      Contact and Visitation Requirements

The Fifth Claim alleges violations of a mandatory duty with regard to social worker contact requirements and parent visitation, citing the DSS regulations.  *See* SAC ¶¶ 298 (alleging defendants failed to arrange monthly visitations with Edison's parents six times in 2015), 300 (alleging Thurmond, Shipe, and Lynch failed to make contact with Edison in 11/2014, 1/2015 – 4/2015, and 9/2017).  The Court will allow these claims to move forward, for the most part.

### 1.      Monthly Social Worker Visits

The California Court of Appeal has held that MPP § 30–342 and its successor regulation § 31–320, which require face-to-face social worker contact each calendar month, "plainly

---

[13] The mandatory duty claims based on an alleged failure to make contact during certain months with Edison's service providers, SAC ¶ 301, are also dismissed because the underlying regulation, MPP § 31–335, does not specify that contact with the service providers must occur on any specific timeframe or at a designated interval.  So even assuming plaintiffs are correct that the social workers failed to make contact with service providers during certain months, there would not have been a violation of a mandatory duty.

constitute[] mandatory requirements which [leave the social worker] no choice on the issue of the frequency of visits to [the child.]" *Scott v. Cnty. of Los Angeles*, 27 Cal. App. 4th 125, 142 (1994). The *Scott* court held that neither discretionary immunity or prosecutorial immunity extended to the monthly contact requirements, and thus the social worker, and by extension the County, were not immune from liability under Government Code §§ 815.2, 820.2, or 821.6. *Id.* at 139-40. Here, the SAC alleges that Edison's social worker missed five monthly visits during his roughly eight-month stay at the Collins home. *See* SAC ¶ 300. It was during his time in the Collins home that Edison's weight plummeted from 75 pounds down to 50. *Id.* ¶ 92. This was a critical time for Edison to receive his monthly face-to-face visits, and defendants Thurmond and Shipe failed in their mandatory duties by not doing so, at least under the facts as alleged.

However, the Court will dismiss this mandatory duty claim as to defendant Lynch, who is alleged to have missed one monthly visit in September 2017. *See id.* ¶ 300. Lynch was Edison's social worker for most, but not all of, this month; a different social worker took over the case on September 26, 2017. *Id.* ¶ 121. Moreover, nothing is alleged to have happened during this particular month as a result of the missed visit. Thus, plaintiffs have not shown proximate cause, as needed to state a mandatory duty claim against Lynch.

### 2. Parent Visitation

MPP § 31–340 requires the social worker arrange for visits between the child and the parents named in the case plan "no less frequently than once each calendar month for children receiving family reunification services." MPP § 31–340.2. The SAC alleges social workers failed to arrange visitations with Edison's parents in February 2015 and April through August 2015. SAC ¶ 298. This is around same period in which plaintiffs allege Edison received several non-emergency surgeries that Edison's parents were unlawfully excluded from attending. *See id.* ¶¶ 85 (January 2015 surgery), 195 (April 2015 surgery). As with the monthly caseworker visits, the Court finds the SAC adequately alleges a violation of a mandatory duty to arrange parent visitation during this period. The Court will allow these claims to proceed against Thurmond, Shipe, and Davis, who were the social workers and supervisor on Edison's case at this time. *See id.* ¶ 80.

United States District Court
Northern District of California

1

2          **C.      Investigation and Abuse Reporting**

3          The SAC alleges violations of various mandatory duties embodied in California statute and

4   in DSS regulations regarding reporting and investigation of suspected child abuse and/or neglect.

5   Plaintiffs allege various individual County defendants: failed to accept reports of abuse or neglect,

6   themselves failed to report known or suspected abuse or neglect during Edison's time in foster care,

7   and did not properly investigate such reports.  SAC ¶ 292.

8          The Court agrees with County defendants that plaintiffs have failed to cure the deficiencies

9   previously identified.  Plaintiffs cite a laundry list of statutes and regulations, against each of the

10  eleven individual County employees, without specifying which mandatory duties, embodied in

11  which laws, each defendant is alleged to have violated.  For instance, plaintiffs cite to California

12  Penal Code § 11166, the general child abuse and neglect reporting statute.  That statute contains

13  eleven subsections, some of which impose a mandatory duty under the case law and some of which

14  do not.  *See, e.g., B.H. v. Cnty. of San Bernardino*, 62 Cal. 4th 168, 181, 186 (2015) (finding Penal

15  Code § 11166(k) imposes a mandatory duty on law enforcement to cross-report the child abuse or

16  neglect reports it receives, but that § 11166(a) does not impose a mandatory duty on an investigating

17  officer to make additional reports to child welfare about the same incident she is already

18  investigating).[14]   Given that liability attaches under Government Code § 815.6  "only if the

19  enactment 'affirmatively imposes the duty and provides implementing guidelines[,]'" and that

20  "[c]ourts have construed this first prong rather strictly," the Court finds that plaintiffs' failure to

21  identify the source of the mandatory duty is fatal to this claim.  *See id.* at 180 (quoting *Guzman v.*

22  *Cnty. of Monterey*, 46 Cal. 4th, 887, 898 (2009)); *see also Cnty. of Los Angeles v. Superior Ct.*, 102

23  Cal. App. 4th 627, 638 (2002) ("Unless the applicable enactment is alleged in specific terms, a court

24  cannot determine whether the enactment relied upon was intended to impose an obligatory duty to

25

26          _____
            [14] Likewise, plaintiffs cite to MPP §§ 31–101, 31–105, 31–125, and 31–501, *see* SAC ¶ 292,

27  which are broad and comprehensive regulations governing general intake protocols, in-person
    investigations, investigation requirements, and child abuse and neglect reporting requirements.

28  Plaintiffs do not specify which of the numerous subsections in these multi-page regulations any
    particular defendant is alleged to have violated.

take official action to prevent foreseeable injuries or whether it was merely advisory in character.")

(quoting *Becerra v. Cnty. of Santa Cruz*, 68 Cal. App. 4th 1450, 1458 (1998)).

The Court grants the motion to dismiss mandatory duty claims regarding investigations of suspected child abuse or neglect, SAC ¶ 292.[15]

### D.    Case Planning

The SAC alleges a host of failures by various individual County defendants regarding the lack of a case plan and failure to comply with the case plan. *See* SAC ¶¶ 294-298. Plaintiffs allege that Edison never received a case plan, as envisioned by federal statute, within 30 calendar days of his removal from his mother's home. *See id.* ¶ 105 & n.1. The only "plan" of any sort that Edison received was the Individual Program Plan the Regional Center created in June 2015, more than nine months after Edison was taken into custody. *Id.* ¶¶ 99, 105.

The Court finds that, at this stage, claims based on breach of a mandatory duty to create or update the case plan within a certain time frame are adequately alleged. These are the claims in paragraphs 295, 296, and 297 of the SAC.[16] These paragraphs allege that Edison's social workers failed to complete an assessment of and document in the case plan Edison's placement needs, as required by MPP § 31–206.31; failed to create a case plan within 30 calendar days of his removal from his mother's home, as required by MPP § 31–210; and failed to update Edison's case plan, as required by MPP §§ 31–225 and 31–230. SAC ¶¶ 295-297.

In *County of Los Angeles v. Superior Court*, the California Court of Appeal analyzed a statute dictating what selection criteria a social worker must consider when placing a child in foster care. 102 Cal. App. 4th at 641 (citing Cal. Welf. & Inst. Code § 16501.1(c)). The court explained that

---

[15] Moreover, to the extent plaintiffs base a mandatory duty claim on the County's alleged failure to *accept* reports of abuse or neglect, the Court agrees with defendants this claim is unsupported in the SAC. The SAC alleges no instance in which a report of suspected abuse or neglect was made to the County that the County refused to accept.

[16] However, the Court *sua sponte* strikes the references to MPP §§ 31–215 and 31–235, *see* SAC ¶¶ 296-297, as those regulations govern children and families who "voluntarily" receive child welfare services. Edison's was not such a case.

1    although the statute created no mandatory duty to place the child in a specific placement, the statute

2    was "mandatory" in the sense that the social worker must "evaluate the stated criteria prior to making

3    a placement selection." *Id.* (citing *Becerra*, 68 Cal. App. 4th at 1459-60).  Likewise here, although

4    social workers may have discretion in the contours of the case plan and what that plan should entail,

5    the regulations do not leave them discretion to simply omit certain portions of the case plan

6    altogether or to fail to follow specific directives regarding when the case plan must be created or

7    updated.  By plausibly alleging that no case plan for Edison was *ever* created, plaintiffs have alleged

8    the violation of a mandatory duty.

9         However, the Court will dismiss paragraphs citing to general case planning regulations, as

10   these are too vague to put defendants on notice of the conduct complained of or to give rise to a

11   mandatory duty under law.  These are the allegations contained at paragraphs 294, a portion of 298,

12   and 299.[17]  For instance, paragraph 299 alleges defendants failed "to take necessary actions to

13   safeguard Edison's growth and development while in foster care placement . . . ."  SAC ¶ 299.

14   Plaintiffs have failed to allege the mandatory duty in specific terms, and much of the regulations on

15   which they rely here are more properly characterized as providing "a general policy statement by

16   which social workers are to be guided" rather than "requir[ing] a particular result[.]"  *See Cnty. of*

17   *Los Angeles*, 102 Cal. App. 4th at 638, 640-41.

18        Accordingly, the case planning mandatory duties claims as stated in the SAC ¶¶ 295-297

19   may proceed.  The motion to dismiss is granted as to the claims as stated in the SAC ¶¶ 294, a

20   portion of 298, and 299.

21

22   **VI.   Remaining State Law Claims**

23        County defendants do not separately move to dismiss the Sixth Claim for negligence or the

24   Seventh Claim for wrongful death.  VMRC defendants argue that, if the federal claims against it are

25   dismissed, the Court should decline to exercise supplemental jurisdiction over the negligence and

26   wrongful death claims.  Given that some federal claims will proceed against some County

27

28   _____

     [17] As stated above, the Court declines to dismiss the portion of paragraph 298 that alleges a
     violation of the duty to arrange monthly visitation with Edison's parents, under MPP § 31–340.

United States District Court
Northern District of California

defendants and some VMRC defendants, the Court finds supplemental jurisdiction exists over the remaining state law claims, under 28 U.S.C. § 1367(a).

**VII.    Amendment**

As the Court previously observed, this case has been pending for several years and is still at the pleading stage.  Prior Order at 34.  It is time for this case to proceed.  The Court previously gave plaintiffs leave to amend all of the claims that were dismissed from the FAC.  To the extent those claims are again dismissed from the SAC, it is in large part because plaintiffs have not cured the deficiencies identified.  At this stage, the Court will grant plaintiffs one final opportunity to amend *only* the factual allegations in the Second Claim, regarding the state-created danger doctrine.

As to all other claims for which dismissal has been granted, because plaintiffs have previously had opportunity to amend and have not cured the deficiencies identified, dismissal is without further leave to amend.

**CONCLUSION**

For the foregoing reasons and for good cause shown, the Court hereby GRANTS IN PART and DENIES IN PART the motions to dismiss, as follows:

- First Claim (Unwarranted Medical Examinations/Procedures; Exclusion of Parents): GRANTED as to Wells.  This claim will proceed against the individual County defendants.

- Second Claim (Failure to Provide Dependent Minor Continued Safety, Security, Adequate Care and Supervision):

  - Count 1 (Special Relationship): DENIED.

  - Count 2 (State-Created Danger): GRANTED.

  - Count 3 (individual VMRC defendants):

    - Under the special relationship doctrine, GRANTED as to Vaughn and De Diego; DENIED as to Wells.

    - Under the state-created danger doctrine, GRANTED.

United States District Court
Northern District of California

28

- Third Claim (*Monell* Liability):
  - Count 2: GRANTED, as to SAC ¶ 273(a), (b), (d).  DENIED as to SAC ¶ 273(c).  The Third Claim will proceed against the County on Count 1 and Count 2, ¶ 273(c).
- Fourth Claim (Federal Child Welfare Statutes): DENIED.  This claim will proceed as to the case plan provisions codified at 42 U.S.C. §§ 671(a)(16) and 675(1).
- Fifth Claim: GRANTED in part and DENIED in part.  DENIED, as to the claims stated in SAC ¶¶ 295-297 (case planning), a portion of ¶ 298 (monthly parent visitation, against Thurmond, Shipe, and Davis), and ¶ 300 (monthly social worker contact, against Thurmond and Shipe).  GRANTED as to the balance of the Fifth Claim.
- Sixth and Seventh Claims: DENIED.

Plaintiffs are granted leave to amend only the Second Claim, regarding the state-created danger doctrine.  **Any Third Amended Complaint is due no later than August 30, 2024.**

**The Court sets a further case management conference for September 20, 2024, at 3:00 p.m.** to be held over Zoom webinar.  A joint case management statement is due **September 13, 2024.**

**IT IS SO ORDERED**.

Dated:  August 16, 2024

SUSAN ILLSTON
United States District Judge

United States District Court
Northern District of California

29